## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

United States of America,

         Plaintiff,                       **Criminal No. 14-30 (JRT/SER)**

v.

Alexander Edward Heying (1) and            **REPORT AND**
Peter Gregory Heying (2)                 **RECOMMENDATION**

         Defendants.

_____

     LeeAnn K. Bell, Esq., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

     Peter B. Wold, Esq., Wold Morrison Law, 247 3rd Avenue South, Minneapolis, Minnesota 55415, for Defendant Alexander Edward Heying (1).

     Steven T. Grimshaw, Esq., 309 Clifton Avenue, Minneapolis, Minnesota 55403, for Defendant Alexander Edward Heying (1).

     Rachael A. Goldberger, Esq., Rachael Goldberger, PA, 250 2nd Avenue South, Suite 286, Minneapolis, Minnesota 55401, for Defendant Peter Gregory Heying (2).

_____

STEVEN E. RAU, United States Magistrate Judge

     The above-captioned case came before the undersigned on Alexander Edward Heying ("Alexander Heying") and Peter Gregory Heying's ("Peter Heying") (collectively, the "Heyings") six motions to suppress, as well as Peter Heying's Motion to Adopt Nonduplicitious Motions of Co-Defendant's [sic] ("Peter Heying's Motion to Join") [Doc. No. 49].[1] Additional dispositive motions will be addressed in separate Reports and Recommendations.[2]

_____

[1]    Specifically, the six motions to suppress in this Report and Recommendation are: Peter Heying's Motion to Suppress Evidence Obtained as a Result of Search and Seizure ("Peter Heying's Motion to Suppress") [Doc. No. 46]; Alexander Heying's Motion to Suppress Results of Administrative Subpoena #0497 to United Parcel Service ("Motion to Suppress Results of

## I.    BACKGROUND[3]

On February 3, 2014, the United States of America (the "Government") filed an indictment charging Defendants with one count of conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 and one count of conspiracy to commit money laundering by promotion in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h). (Indictment) [Doc. No. 1]. Between 2003 and October 15, 2012, the time period for the alleged conspiracy to distribute marijuana, law enforcement conducted several searches of the Heyings and their property and seized large amounts of cash and marijuana. Six of these searches and seizures are the subject of the Heyings' Motions to Suppress.

The Court held an evidentiary hearing on June 6, 2014. (Minute Entry Dated June 6, 2014) [Doc. No. 81]. Testimony from five witnesses was offered and nine exhibits were admitted

---

Administrative Subpoena") [Doc. No. 58]; Alexander Heying's Motion to Suppress Search and Seizure at Bantas Point Lane ("Motion to Suppress Search at Bantas Point Lane") [Doc. No. 59]; Alexander Heying's Motion to Suppress Search and Seizure on March 23, 2003 ("Motion to Suppress March 23, 2003 Search") [Doc. No. 60]; Alexander Heying's Motion to Suppress Search and Seizure at Stone Arch Road ("Motion to Suppress Search at Stone Arch Road") [Doc. No. 61]; and Alexander Heying's Motion to Suppress Search and Seizure at Robinson Creek Road, Ukiah ("Motion to Suppress Search at Robinson Creek Road") [Doc. No. 62] (collectively, "Heyings' Motions to Suppress").

[2]    Specifically, the following motions will be addressed in separate Reports and Recommendations: Peter Heying's Motion to Dismiss Indictment as Violative of the U.S. Constitution (Amend. V, and Article VI/Amend. X), and Request for Evidentiary Hearing [Doc. No. 47]; Alexander Heying's Motion to Dismiss Indictment [Doc. No. 56]; Acacia Lauren Ruiz's ("Ruiz") Notice of Motion and Motion to Suppress Evidence Seized from 342 Oak Knoll Road, Ukiah, California, on Oct. 15, 2012, and Request for Evidentiary Hearing [Doc. No. 68]; Ruiz's Notice of Motion and Motion to Suppress Evidence Seized at Airport on June 13, 2008, and Request for Evidentiary Hearing [Doc. No. 71]; Ruiz's Notice of Motion and Motion to Suppress Evidence Seized from Volkswagen Jetta on Nov. 8, 2007, and Request for Evidentiary Hearing [Doc. No. 73]; Ruiz's Motion to Dismiss [Doc. No. 75]; and Ruiz's Motion to Join Motions Filed on Behalf of Co-Defendants Alexander Heying and Peter Heying [Doc. No. 80].

[3]    Only the background relevant to the Heyings' Motions to Suppress is described here.

into evidence. (*Id.*); *see also* (Ex. & Witness List) [Doc. No. 82].[4] Following the hearing, the Government filed a joint status report summarizing the pending motions and providing additional Government exhibits to the Court. (Gov't's Post-Hr'g Summary of Status of Defs.' Pretrial Mots., "Gov't's Post-Hr'g Summary") [Doc. No. 86]. The Court ordered supplemental briefing, and the Heyings' Motions to Suppress came under advisement on the last day of the briefing schedule, July 21, 2014. *See* (Order Dated June 13, 2014) [Doc. No. 88].

The case is currently set for trial before the Honorable John R. Tunheim on November 10, 2014. (Order Dated Aug. 5, 2014) [Doc. No. 130].

## II.    DISCUSSION

First, Peter Heying's Motion to Join and Alexander Heying's Motion to Suppress Results of Administrative Subpoena will be addressed. The Court then addresses the search issues, beginning with the vehicle search on March 23, 2003. Finally, the Court addresses the four motions that challenge search warrants at the following locations: Stone Arch Road, Lake Street Extension, Robinson Creek Road, and Bantas Point Lane.

### A.    Peter Heying's Motion to Join

As an initial matter, Peter Heying moves the Court to permit him "to adopt and join motions and memoranda filed by the co-Defendant's [sic], . . . insofar as they are applicable generally and specifically to the allegations against [Peter Heying], as having been filed on behalf of [Peter Heying]." (Peter Heying's Mot. to Join). Initially, the Court declined to rule on Peter Heying's Motion to Join because he did not specify those motions he wanted to join. *See* (Order Dated June 9, 2014) [Doc. No. 84 at 3]. The Court ordered the parties to meet and confer, ordered Peter Heying to submit a letter to the Court identifying which motions he intended to

---

[4]     The specifics of the testimony and exhibits will be discussed below in connection with the respective motions.

join, and ordered the Government to file a memorandum addressing the motions Peter Heying intended to join. (*Id.*). Peter Heying then submitted memoranda in support of Alexander Heying's Motion to Suppress Search at Stone Arch Road. *See* (Mem. in Supp. of Mot. to Suppress Evidence as a Result of Search & Seizure, "Peter Heying's Mem. in Supp. Re: Stone Arch Road") [Doc. No. 99]. Peter Heying did not file any other memoranda in support of any other Defendants' motions. The Court recommends that Peter Heying's Motion to Join be granted in part and denied in part. To the extent Peter Heying moves the Court to join Alexander Heying's Motion to Suppress Search at Stone Arch Road, the Court recommends that Peter Heying's Motion to Join be granted. To the extent Peter Heying moves to join any other Defendant's motion to suppress, the Court recommends that Peter Heying's Motion to Join be denied.

### B.      Alexander Heying's Motion to Suppress Results of Administrative Subpoena

Alexander Heying moves the Court to suppress the results of administrative subpoena #0497 ("Subpoena #0497") to the United Parcel Service on February 5, 2008. (Mot. to Suppress Results of Admin. Subpoena). Originally, Alexander Heying argued that the Government had not disclosed the subpoena and therefore he could not determine whether the subpoena was appropriate. (*Id.* at 1); (Alexander Heying's Mem. in Supp. of Mots. to Suppress, "Alexander Heying's Mem. in Supp.) [Doc. No. 100 at 1]. In response, the Government provided a copy of Subpoena #0497 to Alexander Heying, and advised the Court that Alexander Heying is withdrawing this Motion. *See* (Gov't Resp. to Def.'s Mots. to Suppress, "Gov't Resp. to Alexander Heying's Mots. to Suppress") [Doc. No. 116 at 1]. Therefore, the Court recommends that Alexander Heying's Motion to Suppress Results of Administrative Subpoena be denied as moot.

### C.       Search Issues

The remaining motions challenge searches and seizures under the Fourth Amendment. *See* (Peter Heying's Mot. to Suppress); (Mot. to Suppress Search at Bantas Point Lane); (Mot. to Suppress Mar. 23, 2003 Search); (Mot. to Suppress Search at Stone Arch Road); (Mot. to Suppress Search at Robinson Creek Road). The Fourth Amendment provides for the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Because the Fourth Amendment prevents all unreasonable searches and seizures, all warrantless searches and seizures are invalid unless one of the few well-defined exceptions to the warrant requirement is satisfied. *Horton v. California*, 496 U.S. 128, 133 n.4 (1990) (citations omitted).

The Court first addresses the search of a car driven by Alexander Heying on March 23, 2003, in Nebraska. (Mot. to Suppress Mar. 23, 2003 Search); (Gov't's Resp. to Defs.' Pretrial Mots.) [Doc. No. 78 at 5]. The Court then addresses, in chronological order of the searches, the remaining four motions, which are all are "four-corners" challenges to search warrants: Alexander Heying's Motion to Suppress Search at Stone Arch Road (in which Peter Heying joins, as described above), Peter Heying's Motion to Suppress (related to the search at Lake Street Extension), Alexander Heying's Motion to Suppress Search at Robinson Creek Road, and Alexander Heying's Motion to Suppress Search at Bantas Point Lane (the "Four-Corners Motions"). In the Four-Corners Motions, the searches took place at residences owned by the Heyings' parents and used by either Alexander Heying or Peter Heying. The only evidence before the Court are the affidavits provided in support of the search warrants, and the Court only uses the information "found within the four corners of [those] affidavit[s] . . . in determining the

existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citations and internal quotation marks omitted).

### 1.     March 23, 2003 Search

#### a.     Factual Background

Trooper Dean Riedeo ("Trooper Riedeo") testified about the circumstances under which he came to search Alexander Heying's vehicle on March 23, 2003. *See* (Corrected Tr. of Proceedings, "Tr.") [Doc. No. 94 at 9:19–32:11]. Trooper Riedeo is a Nebraska State Patrol sergeant with nearly sixteen years of experience. (*Id.* at 10:17–22). At the Nebraska State Patrol Training Academy, he received twenty-three weeks of training including training related to narcotics. (*Id.* at 11:5–20). He had additional training related to the "trafficking, selling, purchasing[,] and controlled purchases of controlled substances . . . ." (*Id.*); *see also* (*id.* at 14:1–10).

On Sunday, March 23, 2003, Trooper Riedeo was assigned to Traffic Services based in Lincoln, Nebraska. (*Id.* at 11:21–25). On that day, he observed a vehicle in Lancaster County, Nebraska, that appeared to be speeding, which his radar confirmed. (*Id.* at 12:18–13:3). Trooper Riedeo caught up with the vehicle and searched for the Minnesota license plate through state patrol communications. (*Id.*). He learned the vehicle was registered to Alexander Heying, and he initiated a traffic stop. (*Id.*). Trooper Riedeo requested the driver's license and vehicle information, and when he received it, he smelled fresh marijuana. (*Id.* at 13:17–25). He asked the driver, Alexander Heying, to step out of the car and sit in the squad car to determine whether the odor was specific to Alexander Heying or the vehicle. (*Id.* at 14:11–13; 15:2–6). While waiting for his computer system to search for information related to the driver's license and vehicle information, Trooper Riedeo engaged Alexander Heying in conversation about his trip. *See* (*id.*

at 14:14–15:1, 15:12–22). Alexander Heying said he and his passenger left Minnesota for Colorado on Tuesday, March 18, to go snowboarding, where they stayed with friends for a couple of nights and in a hotel for a couple of nights.[5] (*Id.*). Alexander Heying later said he left Minnesota on Monday evening instead of Tuesday evening. (*Id.* at 14:14–15:1). During this conversation, Trooper Riedeo noted that Alexander Heying's demeanor changed: he spoke more quickly and appeared more nervous than he had when Trooper Riedeo had first pulled him over. (*Id.*). Trooper Riedeo then approached the passenger, Mr. Morrison ("Morrison"), who had an expired driver's license. (*Id.* at 15:23–16:10). Trooper Riedeo stated he thought it was odd to have only one licensed driver for a 12- or 13-hour drive. (*Id.*). Morrison, in contrast to Alexander Heying's story, advised Trooper Riedeo that they did not go snowboarding in Colorado. (*Id.* at 16:11–20). While Trooper Riedeo was talking to Morrison, Trooper Dave Frye ("Trooper Frye") arrived. (*Id.* at 17:8–17). After Trooper Riedeo and Trooper Frye conferred briefly, Trooper Riedeo returned to his car to compete the paperwork for Alexander Heying's warning ticket while Trooper Frye spoke to Morrison. (*Id.*). While in his car completing the paperwork, Trooper Riedeo attempted to clarify some of the statements Alexander Heying had made. (*Id.* at 17:18–18:3). At that time, Trooper Riedeo observed Trooper Frye pat down Morrison, who had exited the vehicle. (*Id.*). Trooper Frye said he also smelled fresh marijuana and would "search the vehicle based on probable cause." (*Id.* 18:4–9). Neither Alexander Heying nor Morrison was free to leave during the traffic stop. (*Id.* at 31:9–22). The vehicle search yielded unspecified amounts of marijuana and cash, which Alexander Heying moves to suppress. *See* (*id.* at 19:7–11).

---

[5]    Testimony only reflects days of the week, instead of specific dates. The Court adds the dates to provide a better sense of the timeline discussed.

b.      **Legal Standard**

The automobile exception to the warrant requirement allows police officers to conduct a warrantless search of a vehicle and containers within the vehicle whenever probable cause exists. *United States v. Sample*, 136 F.3d 562, 564 (8th Cir. 1998) (citing *California v. Acevedo*, 500 U.S. 565, 579–80 (1991)). Under this exception, police may search a vehicle if they have probable cause to believe that the vehicle contains contraband. *United States v. Payne*, 119 F.3d 637, 642 (8th Cir. 1997) (citing, *inter alia*, *Chambers v. Maroney*, 399 U.S. 42, 51 (1970)). "In such circumstances, the police may search every part of the car and its contents that may conceal the object of the search" or evidence of a crime. *Id.* (citing *Acevedo*, 500 U.S. at 573–76); *see United States v. Thompson*, 906 F.2d 1292, 1298 (8th Cir. 1990).

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Nolen*, 536 F.3d 834, 839 (8th Cir. 2008) (quoting *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000)). "[T]he odor of an illegal drug can be highly probative in establishing probable cause for a search." *United States v. Caves*, 890 F.2d 87, 90 (8th Cir. 1989) (citing *Johnson v. United States*, 333 U.S. 10, 13 (1948)).

An officer may detain an individual during a traffic stop "to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *United States v. Suitt*, 569 F.3d 867, 870 (8th Cir. 2009) (citation and quotation omitted). An officer may reasonably ask "for the driver's license, the vehicle's registration, as well as inquir[e] about the occupants' destination, route, and purpose." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (citation and internal quotation marks omitted). The individual may be detained "while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic

violation." *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 647 (8th Cir. 1999).

These time-consuming tasks "may include a check of driver's license, vehicle registration, . . .

criminal history, and the writing of the citation or warning." *United States v. Olivera-Mendez*,

484 F.3d 505, 509 (8th Cir. 2007). "An officer's suspicion of criminal activity may reasonably

grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are

uncovered." *United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002) (citation omitted).

"If, during a traffic stop, an officer develops a reasonable, articulable suspicion that a

vehicle is carrying contraband, he has 'justification for a greater intrusion unrelated to the traffic

offense.'" *United States v. Bloomfield*, 40 F.3d 910, 918 (8th Cir. 1994) (quoting *United States v.

Cummins*, 920 F.2d 498, 502 (8th Cir. 1990)). "Whether an officer has reasonable suspicion to

expand the scope of a stop is determined by looking at 'the totality of the circumstances, in light

of the officer's experience.'" *Sanchez*, 417 F.3d at 976 (quoting *United States v. Carrate*, 122

F.3d 666, 668 (8th Cir. 1997)).

### c.      Analysis

Alexander Heying argues that Trooper Riedeo did not have probable cause to search the

vehicle, and that a search incident to a ticket is impermissible. (Alexander Heying's Mem. in

Supp. at 3). He also argues that he was "seized" for longer than the time necessary to issue the

ticket. (*Id.*).

### i.      Probable Cause

The Court finds Trooper Riedeo and Trooper Frye had probable cause to search

Alexander Heying's vehicle. Both troopers identified the smell of marijuana, which is "highly

probative" of probable cause. *See Caves*, 890 F.2d at 90 (citation omitted); *see also* (Tr. at

13:17–25, 18:4–9). More specifically, Trooper Riedeo smelled marijuana as soon as he began

9

speaking with Alexander Heying. (*Id.* at 13:17–25). While Trooper Riedeo was waiting for his computer to find information about Alexander Heying's driver's license and vehicle information, Alexander Heying made statements that were internally inconsistent—first stating that he and Morrison left on Tuesday, then stating that they left on Monday—and began to act more nervous. (*Id.* at 14:14–15:1). Morrison's statements that they did not go snowboarding conflicted with Alexander Heying's statements. (*Id.* at 14:14–15:1, 15:12–22, 16:11–20). While inconsistent statements by themselves may not be sufficient to establish probable cause, they contribute to the totality of the circumstances. *See United States v. Valle Cruz*, 452 F.3d 698, 703 (8th Cir. 2006). In other words, even though the odor of marijuana may be sufficient to establish probable cause, Alexander Heying and Morrison's inconsistent statements contributed to the totality of the circumstances establishing probable cause. Because the troopers had probable cause to search Alexander Heying's vehicle, the results of the March 23, 2003 search should not be suppressed.

### ii.    Search Incident to Citation

Alexander Heying argues that under *Knowles*, an officer cannot search a vehicle incident to issuing the occupant a citation. (Alexander Heying's Mem. in Supp. at 3) (citing *Knowles v. Iowa*, 525 U.S. 113, 118–19 (1998)). In *Knowles*, the  defendant was pulled over for speeding and although the officer could have arrested the defendant, the officer chose to issue a citation to the defendant rather than arrest him. *Knowles*, 525 U.S. at 114. The officer then conducted a full search of the vehicle, which yielded a bag of marijuana and a pipe. *Id.* The officer later conceded he did not have probable cause or the defendant's consent to search the vehicle. *Id.* at 114–15. The United States Supreme Court found that the officer's vehicle search incident to a speeding citation was distinguishable from a search incident to arrest.  *Knowles*, 525 U.S. at 118–19. The Supreme Court stated that the two justifications for search incident to arrest—officer safety and

the need to discover and preserve evidence—do not apply equally to a search incident to citation. *Id.* at 117–18. Although officer safety cannot be disregarded and may justify asking a driver and passengers to exit the vehicle, "it does not by itself justify the often considerably greater intrusion attending a full field-type search." *Id.* at 117. Additionally, the Supreme Court said that by the time the officer stopped the defendant, the officer had "all the evidence necessary to prosecute that offense[.]" *Id.* at 118. No further evidence was needed. *Id.*

Here, and unlike the scenario in *Knowles*, Trooper Riedeo and Trooper Frye did not search the vehicle based only on the citation. Instead, probable cause in the form of the odor of marijuana developed after Alexander Heying was initially stopped. *See* (Tr. at 13:17–25). Additionally, Alexander Heying's inconsistent statements contributed to probable cause. *See, e.g.*, *United States v. Martel-Martines*, 988 F.2d 855, 858–59 (8th Cir. 1993) (finding evasive and inconsistent statements in response to routine questions contributed to probable cause for warrantless vehicle search). Thus, Trooper Riedeo and Trooper Frye had probable cause, beyond Trooper Riedeo's mere intent to issue Alexander Heying a citation, to search the vehicle.

### iii.     Length of Seizure

Finally, Alexander Heying argues that he was detained beyond the time necessary to issue the citation. (Alexander Heying's Mem. in Supp. at 3) (citing *Illinois v. Caballes*, 543 U.S. 405, 406 (2005)). He cites *Caballes* for the following general principle: "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Caballes*, 543 U.S. at 407.[6]

---

[6]     The specific facts and holding of *Caballes* are inapposite: The United States Supreme Court considered "[w]hether the Fourth Amendment requires reasonable, articulable suspicion to justify using a drug-detection dog to sniff a vehicle during a legitimate traffic stop." *Caballes*,

In the instant case, the testimony of Trooper Riedeo establishes that he smelled marijuana and heard inconsistent statements while he was still completing time-consuming but typical and necessary tasks. *See* (Tr. at 14:14–15:1, 15:12–22, 16:11–20). Trooper Riedeo testified that he smelled marijuana when Alexander Heying gave him the requested documents. (*Id.* at 13:17–25). He spoke with Alexander Heying while his computer was searching for information. (*Id.* at 14:14–15:1, 15:12–22). Trooper Riedeo returned to his car to complete the paperwork necessary to issue Alexander Heying a citation, while Trooper Frye patted down Morrison. (*Id.* at 17:8–18:3).

Even if Trooper Riedeo physically issued the citation at that time and told Alexander Heying he could leave—which is **not** established by the record—the troopers had reasonable, articulable suspicion to expand the stop into a search of the vehicle. *See* (*id.*); *see also Sanchez*, 417 F.3d at 976 (citation omitted). More specifically, both troopers smelled marijuana consistent with their training and experience, and Alexander Heying and Morrison provided inconsistent statements about their travels. *See* (Tr. at 11:5–20, 14:1–10, 18:14–19).

### iv.   Summary

The odor of marijuana, first detected by Trooper Riedeo at the inception of the traffic stop, in addition to inconsistent statements, was sufficient probable cause for the troopers to

---

543 U.S. at 407 (internal quotation marks and citations omitted). The defendant was pulled over for speeding, and another officer arrived at the scene with a drug-detection dog, who alerted to the trunk. *Id.* at 406. The officers searched the trunk, where they found marijuana, and the defendant was ultimately convicted of a narcotics offense. *Id.* at 406–07. The Supreme Court accepted "the state court's conclusion that the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop." *Id.* at 408. It found that the use of a narcotics-detection dog "generally does not implicate legitimate privacy interests[,]" and therefore any intrusion of privacy "does not rise to the level of a constitutionally cognizable infringement." *Id.* at 409.

conduct a warrantless search of Alexander Heying's car. Therefore, the Court recommends that Alexander Heying's Motion to Suppress the March 23, 2003 search be denied.

### 2.    Four-Corners Motions

In determining if probable cause exists, a court considers the information that was before the issuing magistrate judge and affords "great deference to the issuing judge's determination." *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (citation omitted). Where no evidence outside of the affidavit was submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *Solomon*, 432 F.3d at 827 (citations and internal quotation marks omitted). Probable cause exists when the likelihood of finding evidence of a crime in a certain place is fairly probable. *United States v. Chrobak*, 289 F.3d 1043, 1046 (8th Cir. 2002). Moreover, "'[t]he source and credibility of evidence in support of a warrant request is considered in the totality of the circumstances analysis, and a warrant is proper so long as the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence.'" *Id.* (quoting *United States v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999)).

"[P]robable cause must exist at the time of the search and not merely at some earlier time." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005) (citations omitted). Delay "may make probable cause fatally stale," but timing "is not always the controlling factor." *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995). Because "[t]here is no fixed formula for determining when information has become stale[,] . . . the timeliness of the information depends on the circumstances of the case . . . ." *Kennedy*, 427 F.3d at 1141 (internal citations and quotation marks omitted). Factors to be considered include "the nature of the criminal activity involved and the kind of property subject to the search." *Maxim*, 55 F.3d at 397 (citation and

internal quotation marks omitted). Probable cause may exist "where recent information corroborates otherwise stale information[.]" *United States v. Ozar*, 50 F.3d 1440, 1446 (8th Cir. 1995).

When information from a confidential informant is contained in an application for a search warrant, the totality of the circumstances must show that the informant is sufficiently reliable. *See United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004) (citing *Illinois v. Gates,* 462 U.S. 213, 233 (1983)); *United States v. Gladney*, 48 F.3d 309, 313 (8th Cir. 1995) (explaining that even when an informant's information is only partly corroborated, probable cause will still exist when the affidavit also describes the informant's proven reliability established by previous seizures of controlled substances based on the informant's information). An informant may show sufficient reliability through corroboration "by other evidence, or if the informant has a history of providing reliable information." *Lucca*, 377 F.3d at 933.

"[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue[.]" *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). "[A]n officer executing a search warrant may rely in the permissibility of the issuing judge's inference that such a nexus exists when that inference has 'common sense appeal[.]'" *United States v. Perry*, 531 F.3d 662, 664 (8th Cir. 2008) (citation omitted).

Even if a search warrant lacks probable cause, evidence seized pursuant to a search warrant is admissible if it was objectively reasonable for the officers executing the search warrant to have relied in good faith on the validity of the search warrant. *United States v. Carpenter*, 341 F.3d 666, 669 (8th Cir. 2003) (citing *United States v. Leon,* 468 U.S. 897, 922–23 (1984)). The *Leon* "good faith exception" does not apply in the following circumstances:

(1)     when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

(2)     when the issuing judge wholly abandoned his judicial role in issuing the warrant;

(3)     when the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and

(4)     when the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Fiorito*, 640 F.3d 338, 345 (8th Cir. 2011) (internal citations omitted).

### a.     Motion to Suppress Search at Stone Arch Road—September 15, 2005

### i.     Affidavit

Both Alexander Heying and Peter Heying move to suppress the results of a search warrant executed at 2660 Stone Arch Road in Woodland, Minnesota ("2660 Stone Arch Road"), owned by the Heyings' father, Gregory Heying.[7] *See* (Mot. to Suppress Search at Stone Arch Road); (Peter Heying Mem. in Supp. re: Stone Arch Road); *see also* (Application for Search Warrant & Supporting Aff., "McGill Aff.," Ex. 2, Attached to Gov't's Post-Hr'g Summary) [Doc. No. 86-1]. Officer Christopher McGill ("Officer McGill") provided the following relevant information in his affidavit. (*Id.*).

Officer McGill worked for the Medina Police Department, and was assigned to the West Metro Drug Task Force. (*Id.* at 2).[8] In the seventy-two-hour period before applying for the search warrant, he received information from a Confidential Reliable Informant ("CRI") that Bjorn Poulsen ("Poulsen") was selling marijuana and cocaine from his home in Deephaven. (*Id.*). In

---

[7]     At times, 2660 Stone Arch Road is described as being in Woodland, and at other times, it is described as being in Wayzata. (Application for Search Warrant & Supporting Aff., "McGill Aff.," Ex. 2, Attached to Gov't's Post-Hr'g Summary) [Doc. No. 86-1 at 1, 2]. Because the address, 2660 Stone Arch Road, is consistently the same, the Court presumes all activity at 2660 Stone Arch Road refers to the same residence.

[8]     The cited page numbers refer to those assigned by CM/ECF.

the past, the CRI had provided detailed and accurate information leading to the recovery of controlled substances and arrests, and Officer McGill confirmed information the CRI provided about Poulsen. (*Id.*). Officer McGill's research into Poulsen revealed that his neighbors had complained of short-term traffic at Poulsen's residence, and that Poulsen was arrested the year before for possession of marijuana, drug paraphernalia, fraudulent identification, "huff/ingest," and for an underage liquor violation. (*Id.*).

Task force officers set up surveillance at Poulsen's residence. (*Id.*). Poulsen arrived in an Oldsmobile carrying a long gun case. (*Id.*). Three men arrived in two different cars. (*Id.*). Poulsen showed the men a long gun, and the two cars later drove away. (*Id.*). A short time later, Poulsen drove away in a Geo Prism. (*Id.*). The task force officers followed him to 2660 Stone Arch Road, a residence he later left while sitting in the passenger seat of a blue Dodge pickup. (*Id.*). Task force officers followed the pickup to Poulsen's residence, where it later left (again, with Poulsen in the passenger seat) and eventually returned to 2660 Stone Arch Road. (*Id.*). When the pickup left 2660 Stone Arch Road a short time later, Poulsen was not in the vehicle. (*Id.*). Task force officers followed the pickup as its young male driver met with several cars, conducting what appeared to be drug sales. (*Id.*).

Officer McGill and the CRI decided to purchase marijuana from Poulsen using an unwitting party ("UP"). The CRI and the UP made the arrangements, and task force officers observed the CRI and the UP near Poulsen's residence. (*Id.*). The CRI told task force officers Poulsen was not home because he was picking up the marijuana, and Poulsen told the UP to drive around until Poulsen got home. (*Id.*). Task force officers observed a small red car arriving at Poulsen's home. (*Id.* at 3). The male passenger exited the vehicle, and removed something from the trunk. (*Id.*). The small red car then drove away, and Poulsen called the UP to tell the UP

he was home. (*Id.*). The CRI overheard Poulsen tell the UP that Poulsen had just picked up the marijuana and it arrived with him in the small red car. (*Id.*). The CRI and the UP parked in Poulsen's driveway and the UP went into Poulsen's residence. (*Id.*). A short time later, the UP returned to the CRI's vehicle. (*Id.*). After the CRI dropped off the UP, the CRI met with task force officers and gave them the substance the UP purchased from Poulsen, which filed-tested positive for marijuana. (*Id.*).[9] Apparently while the UP and the CRI were at Poulsen's residence, task force officers followed the small red car after it left Poulsen's residence. (*Id.*). The small red car drove to 2660 Stone Arch Road. (*Id.*).

Task force officers observed Poulsen arrive at and stay at 2660 Stone Arch Road several times during an unspecified time period. (*Id.* at 3). Officer McGill believed 2660 Stone Arch Road was the source of marijuana. (*Id.*). Officer McGill's Hennepin County Property Information search showed that Gregory Heying owned 2660 Stone Arch Road. (*Id.*) Officer McGill learned Gregory Heying has two sons, Alexander Heying and Peter Heying. (*Id.*). Officer McGill investigated Alexander Heying's criminal history and learned he was arrested on March 23, 2003, near Lincoln, Nebraska for felony marijuana possession with intent to deliver. (*Id.*).

Based on his training and experience, Officer McGill believed that the people residing at 2660 Stone Arch Road were using, possessing, and/or dealing controlled substances. (*Id.* at 4).

---

[9]    As is typical in a controlled purchase such as this one, the CRI's person and vehicle were searched for drugs, money, and contraband both before and after the controlled purchase and the CRI and the UP remained in view of the task force officers on the way to the meeting location. (McGill Aff. at 2–3); *see, e.g.*, *United States v. Ennen*, No. Crim. 05-417 (1) (RHK/SRN), 2006 WL 839500, at *4 (D. Minn. Mar. 28, 2006) (describing the same process).

ii.      **Peter Heying's Argument**

Peter Heying argues the results of the search warrant executed at Stone Arch Road should be suppressed because there was no probable cause to support the search warrant.[10] (Peter Heying's Mem. in Supp. re: Stone Arch Road at 3). In support, Peter Heying argues there was no evidence of Alexander Heying or Peter Heying at the residence, and there is no evidence showing that marijuana or evidence of marijuana would be found at the home. (Peter Heying's Mem. in Supp. Re: Stone Arch Road at 3–4).

Peter Heying also argues there is no nexus between "evidence being searched for and the place being searched[.]" (*Id.* at 5–6) (citing *Tellez*, 217 F.3d at 550). Specifically, he argues there is no statement that Poulsen carried anything out of 2660 Stone Arch Road, although 2660 Stone Arch Road was under surveillance; there is no statement that the pickup truck Poulsen drove to his residence had a bag in it; there is no statement that residents of 2660 Stone Arch Road participated in any "trafficking activity" or had criminal records involving marijuana; and there is no statement that the small red car that ostensibly carried marijuana to Poulsen's home ever left 2660 Stone Arch Road. (*Id.* at 5–6). Peter Heying argues that the search warrant affidavit only gives rise to a "guess" that marijuana came from 2660 Stone Arch Road, which is insufficient to support probable cause. (*Id.* at 6). Finally, he argues that the 2660 Stone Arch Road search warrant relies on an affidavit "so deficient in indicia of probable cause" that it fails to meet any "good faith exception" established by *Leon*. (*Id.*).

---

[10]      Neither the Heyings nor the Government specifies what items the Heyings seek to suppress. Another affidavit in this case describes the items seized from Stone Arch Road: "79 grams of marijuana, 13 grams of hash, four digital gram scales, packaging materials, two handguns, suspected drug notes, a large black duffle bag with marijuana residue in it[,] and $34,360 [in] U.S. currency." (Application for Search Warrant & Supporting Aff., "Boelter Aff.," Ex. 3, Attached to Gov't's Post-Hr'g Summary) [Doc. No. 86-2 at 2] (affidavit in support of application for search warrant of 13603 Lake Street Extension, Minnetonka, Minnesota).

18

### iii.     Alexander Heying's Argument

Alexander Heying argues that the search and seizure at 2660 Stone Arch Road was not supported by probable cause and that the search "did not otherwise comply with any recognized exception to these constitutional requirements." (Mot. Suppress Search at Stone Arch Road). More specifically, Alexander Heying argues that the search warrant application does not "establish a necessary nexus between potential contraband and the residence." (Alexander Heying's Mem. in Supp. at 3) (citing *Tellez*, 217 F.3d at 550).

### iv.     Analysis

The Court finds the warrant to search 2660 Stone Arch Road was supported by probable cause. First, law enforcement observed a blue pickup truck leave 2660 Stone Arch Road to meet with several vehicles to conduct what appeared to be drug transactions. (McGill Aff. at 2). Poulsen, who later sold marijuana to the CRI and the UP, also was observed both at 2660 Stone Arch Road and in the blue pickup. (*Id.*). Second, when the CRI and the UP approached Poulsen's residence for the controlled purchase, Poulsen said he was picking up the marijuana. (*Id.* at 3). A small red car then arrived at Poulsen's residence and a man exited the vehicle and removed something from the trunk. (*Id.*). Poulsen then called the UP to say that he (Poulsen) was home. (*Id.*). In other words, Poulsen arrived in the red car, and the object he removed from the trunk contained the marijuana. *See* (*id.*). The red car then drove to 2660 Stone Arch Road. (*Id.*). Therefore, the nexus between the contraband—marijuana—and 2660 Stone Arch Road is established by the blue truck departing the residence to conduct apparent drug transactions and the red car, believed to carry marijuana, returning to 2660 Stone Arch Road after leaving Poulsen at his residence.

Because the Court finds the search warrant was supported but sufficient probable cause, the Court does not conduct a separate analysis on whether the good-faith exception applies. *See Leon*, 468 U.S. at 922–23. The Court recommends the motion to suppress the results of the search of 2660 Stone Arch Road be denied.

>    **b.     Peter Heying's Motion to Suppress Search at Lake Street Extension—October 15, 2012**

Peter Heying filed a memorandum regarding a search that was not previously challenged by any other Defendant. *See* (Mem. in Supp. of Mot. to Suppress Evidence Obtained as a Result of Search & Seizure, "Mem. in Supp. Re: Lake Street Extension") [Doc. No. 98]. Therefore, the Court construes Peter Heying's Motion to Suppress as moving the Court to suppress the results of the search conducted at the residence addressed in Peter Heying's memorandum, the Lake Street Extension residence.

>    **i.     Affidavit**

Sergeant Todd Boelter ("Sgt. Boelter") provided the following information in his affidavit. *See* (Boelter Aff.). Sgt. Boelter worked with the West Hennepin Public Safety Department in Hennepin County, Minnesota, and was assigned to the West Metro Drug Task Force. (*Id.* at 2).[11] In September 2005, Sgt. Boelter assisted with the search of 2660 Stone Arch Road, and Peter Heying and his mother, Jean Heying, were present. (*Id.*). The following items were seized from 2660 Stone Arch Road: "79 grams of marijuana, 13 grams of hash, four digital gram scales, packaging materials, two handguns, suspected drug notes, a large black duffle bag with marijuana residue in it[,] and $34,360 [in] U.S. currency." (*Id.*). In October 2009, a cooperating source ("CS-1") advised Sgt. Boelter that Alexander Heying's parents bought Alexander Heying a house in Ukiah, California, and that Alexander Heying was growing

---

[11]     The cited page numbers refer to those assigned by CM/ECF.

marijuana there and selling it in Minnesota. (*Id.*). CS-1 also told Sgt. Boelter that Alexander Heying's younger brother Peter Heying receives large amounts of marijuana from Alexander Heying and CS-1 has observed duffel bags full of marijuana at Peter Heying's residence, 13603 Lake Street Extension, Minnetonka, Minnesota. (*Id.*). In December 2011, Officer John Vinck ("Officer Vinck") of the West Metro Drug Task Force advised Sgt. Boelter that Officer Vinck's cooperating source ("CS-2") advised that Peter Heying was dealing large amounts of marijuana and that CS-2 had received 25 pounds of marijuana in exchange for $65,000.[12] (*Id.*). On September 25, 2012, aerial surveillance of Alexander Heying's property at 2451 Robinson Creek Road in Ukiah, California, showed marijuana plants, and Drug Enforcement Agency ("DEA") officers applied for a search warrant to search the property at 2451 Robinson Creek Road. (*Id.*). On October 8, 2012, Sgt. Boelter searched the garbage at 13603 Lake Street Extension and found the following:

> three marijuana stems . . . , five partially burnt marijuana cigarettes . . . , an empty box of 60-count Ziploc gallon size bags, three empty packs of Zig Zag rolling papers, an empty hard pack of Camel cigarettes with a green leafy residue in it . . . , and numerous documents and mailings with the name of Peter Heying, 13603 Lake Street Extension, Minnetonka, Minnesota 55345, on them.

(*Id.*). The marijuana stems, marijuana cigarettes, and the residue one the empty hard pack of Camel cigarettes all field-tested positive for marijuana. (*Id.*). Sgt. Boelter learned that 13603 Lake Street Extension is owned by Jean Heying and that Gregory Heying pays the taxes. (*Id.* at 3). Sgt. Boelter observed a silver Chevrolet pickup in the garage and black Ford pickup parked in front of the garage; both vehicles are registered to Peter Heying. (*Id.* at 2–3). Based on these observations, in addition to his training, experience, and interviews with drug dealers, Sgt. Boelter averred that he believed the person or people residing at 13603 Lake Street Extension

---

[12]     The affidavit does not clarify whether CS-1 and CS-2 are different cooperating sources.

were "keeping marijuana, records, documents, money[,] and other evidence of illegal activities."
(*Id.* at 3).

### ii.     Peter Heying's Argument

Peter Heying concedes he resided at 13603 Lake Street Extension. (Mem. in Supp. re: Lake Street Extension at 3). Peter Heying argues the information in the affidavit from 2005, 2009, and 2011 was stale. (*Id.* at 4–6). Peter Heying further argues the aerial surveillance of Alexander Heying's home in Ukiah, California cannot corroborate CS-1's information because the information was three years old at the time of the aerial surveillance. (*Id.* at 7). Additionally, Peter Heying argues the information from cooperating sources in 2009 and 2011 is not reliable because the affidavit does not include evidence that the cooperating sources' information has been corroborated or that he or she "has a track record of supplying reliable information." (*Id.* at 6). Peter Heying also argues there is no nexus between the evidence sought at 13603 Lake Street Extension and Alexander Heying's home in Ukiah, California. (*Id.* at 7). With respect to the garbage search, Peter Heying asserts the items recovered suggest only personal use, that Ziploc bags are used for many things that do not involve drugs, and that a garbage pull revealing the presence of marijuana alone is not sufficient to find probable case. (*Id.* at 8–9). Finally, Peter Heying argues that the good faith exception described in *Leon* does not apply because the affidavit was deficient of indicia of probable cause. (*Id.* at 9–10).

### iii.     Analysis

The Court finds the search warrant application for 13603 Lake Street Extension contains sufficient probable cause. The Court analyzes each of Peter Heying's arguments in turn.

### a)    Staleness

First, although the information from 2005 (the results of the execution of a search warrant at 2660 Stone Arch Road), 2009 (statements from CS-1 that Alexander Heying grows marijuana at his home in California and gives Peter Heying marijuana to sell at 13603 Lake Street Extension), and 2011 (statement from CS-2 that he or she bought 25 pounds of marijuana from Peter Heying for $65,000) was not very recent at the time of the 13603 Lake Street Extension search warrant application, the passage of time is "less significant" where, as here, law enforcement suspects ongoing criminal activity. *See United States v. LaMorie*, 100 F.3d 547, 554 (8th Cir. 1996). Additionally, "where recent information corroborates otherwise stale information, probable cause may be found." *Ozar*, 50 F.3d at 1446 (citation and internal quotation marks). Here, the information from 2009 that Alexander Heying grows marijuana at his home in California was corroborated by aerial surveillance of the property in 2012. (Boelter Aff. at 2). The information from 2011 that Peter Heying sold marijuana was corroborated by the discovery of marijuana stems, partially burnt marijuana cigarettes, rolling papers, an empty cigarette container containing marijuana residue, and an empty box of Ziploc bags (commonly used to package drugs) in the garbage at 13603 Lake Street Extension. *See* (*id.*). Therefore, although the information from 2005, 2009, and 2011 arguably is stale, the information from 2009 and 2011 was corroborated and contributes to a finding of probable cause.

### b)    Reliability of Confidential Sources

Peter Heying argues the confidential sources' 2009 and 2011 statements were not reliable. (Mem. in Supp. re: Lake Street Extension at 6–7). As stated above, aerial surveillance of Alexander Heying's residence in Ukiah, California, in 2012, where marijuana plants were observed growing, corroborated CS-1's report in 2009 that Alexander Heying was growing

marijuana in Ukiah, California. *See* (Boelter Aff. at 2). *See Lucca*, 377 F.3d at 933 (stating that corroboration of evidence shows sufficient reliability of an informant). Peter Heying argues that the 2009 information cannot be corroborated in 2012 because three years passed between the two events. (Mem. in Supp. re: Lake Street Extension at 7). But as discussed above, Eighth Circuit case law permits recent information to corroborate otherwise stale information. *Ozar*, 50 F.3d at 1446. Therefore, because CS-1's statement in 2009 was corroborated by more recent evidence, it is sufficiently reliable to contribute to a finding of probable cause. *See id.* ("[W]here recent information corroborates otherwise stale information, probable cause may be found.") (citation and quotation omitted). The Court does not rest the necessary probable cause exclusively on CS-1's 2009 statements; instead, the Court finds CS-1 had some reliability because his or her information was later corroborated by aerial surveillance.

In 2011, CS-2 informed Officer Vinck that he or she purchased 25 pounds of marijuana from Peter Heying. (Boelter Aff. at 2). "[S]tatements against the penal interest of an informant naturally carry considerable weight." *LaMorie*, 100 F.3d at 553. Thus, the Court finds CS-2's statement to a law enforcement officer that he or she purchased a large amount of a controlled substance reliable because it was made against his or her penal interest. *See id.*

### c)    Nexus

Peter Heying argues there is no nexus between 13603 Lake Street Extension and Alexander Heying's house in California. (Mem. in Supp. re: Lake Street Extension at 7). But CS-1 provides the nexus with the statement that Alexander Heying grows marijuana on his property and sends large amounts of marijuana to Peter Heying. (Boelter Aff. at 2). CS-1 also personally observed duffle bags of marijuana at Peter Heying's house, 13603 Lake Street Extension. (*Id.*).

**d)**     **Garbage Search**

Finally, Peter Heying argues that results of the garbage pull only suggest personal marijuana use, that Ziploc bags are not illegal, and that marijuana alone does not establish probable cause. (Mem. in Supp. re: Lake Street Extension at 8). In support of his argument, Peter Heying cites two District Court of Appeal of Florida cases, which he urges this Court to follow. (*Id.* at 8–9) (citing *Gesell v. State*, 751 So.2d 104, 105 (Fla. Dist. Ct. App. 1999); *Raulerson v. State*, 714 So.2d 536 (Fla. Dist. Ct. App. 1998)). In *Raulerson*, the court found that with respect to one garbage pull that resulted in stems, seeds, and pieces of cannabis, the affidavit did not contain "other sufficient material facts to indicate a fair probability that cannabis would be found in Raulerson's home." *Raulerson*, 714 So.2d at 537. In *Gesell*, the court found that finding one-tenth of a gram of marijuana in a garbage pull and an anonymous call about suspected drug activity was insufficient to support the subsequent search warrant. *Gesell*, 751 So.2d at 105. The District Court of Appeal of Florida stated that in both *Raulerson* and *Gesell*,

> the officers did not conduct any surveillance or independent follow-up investigation to corroborate the anonymous tip, perform additional garbage pulls, or develop any other facts to show a pattern of continuous drug activity and establish a fair probability that cannabis would be found on the premises. Moreover, there was nothing found in the contents of the trash here that, in and of itself, supported a reasonable conclusion that additional contraband would be found in the house.

*Id.* at 105–06.

In contrast, this Court finds the affidavit supplied several "other facts to show a pattern of continuous drug activity and establish a fair probability that [marijuana] would be found on the premises." *See id.* The affidavit contained information from a past search warrant, information from cooperating sources, and aerial surveillance of Alexander Heying's California residence **in**

**addition to** the results of the garbage pull. *See* (Boelter Aff. at 2). Therefore, the garbage pull does not stand alone and contributes to probable cause.

### e)      Totality of the Circumstances

The Court reviews all of the evidence in the affidavit under a "totality of the circumstances" analysis. *See Chrobak*, 289 F.3d at 1046 (citation omitted). While some of the evidence presented may not have provided sufficient probable cause if presented in isolation, "the evidence as a whole creates a reasonable probability that the search will lead to the discovery of evidence." *Id.* (citation and internal quotation marks omitted). Because the Court finds the search warrant was supported by sufficient probable cause, the Court does not conduct a separate analysis on whether the good-faith exception applies. *See Leon,* 468 U.S. at 922–23.

The Court recommends that Peter Heying's motion to suppress evidence seized as the result of the search executed at 13603 Lake Street Extension be denied.

### c.      Alexander Heying's Motion to Suppress Search at Robinson Creek Road—October 15, 2012

Alexander Heying moves to suppress the search and seizure at 2451 Robinson Creek Road, Ukiah, California ("2451 Robinson Creek Road"), alleging that the search warrant is not supported by probable cause. (Mot. to Suppress Search at Robinson Creek Road at 1).

### i.      Affidavit

The affidavit is signed by DEA Task Force Officer Chance Landreneaux ("Officer Landreneaux"). (Application for Search Warrant, *In the Matter of Mendocino Cnty. APN 185-13-02-00 & 185-120-04-00, 2451 Robinson Creek Road, Ukiah, Cnty. of Mendocino, Cal.*, "Landreneaux Aff.," Ex. 5, Attached to Gov't's Post-Hr'g Summary) [Doc. No. 86-4]. Office

Landreneaux details his extensive training and narcotics expertise. (*Id.* at 3–8, 11–21).[13] Sgt. Boelter informed Officer Landreneaux of his belief that Alexander Heying was using the property at 2451 Robinson Creek Road to grow marijuana. (*Id.* at 10). Officer Landreneaux confirmed that the property was owned by Gregory Heying and Jean Heying. (*Id.*). Sgt. Boelter identified Gregory Heying as Alexander Heying's father. (*Id.*). Officer Landreneaux asked Sergeant Bruce Smith ("Sgt. Smith") to conduct aerial surveillance over 2451 Robinson Creek Road based on Sgt. Smith's experience in the Mendocino County Sheriff's Office's Marijuana Eradication Unit. (*Id.*). Sgt. Smith identified marijuana cultivation at 2451 Robinson Creek Road during aerial surveillance on September 25, 2012. (*Id.* at 10–11). Officer Landreneaux reviewed Sgt. Smith's photographs of the flyover, and also observed several marijuana plants growing on the premises of 2451 Robinson Creek Road. (*Id.* at 11). He also knew that "Mendocino County is part of the 'Emerald Triangle[,]' which is a large marijuana cultivation area of northern California. (*Id.*). Officer Landreneaux compared satellite photographs to Sgt. Smith's photographs to determine they were the same premises. (*Id.*).

### ii.    Alexander Heying's Argument

Alexander Heying argues that the search warrant is not supported by probable cause because there is no evidence that the marijuana grown was not for medical use, which has been legal in California for over a decade. (Mot. to Suppress Robinson Creek Road Search at 1). He further argues that two Department of Justice memoranda (dated August 29, 2013, and February 14, 2014) and one Department of Treasury memorandum (dated February 14, 2014) show that the Government's policies "allow[] for the distribution of marijuana in [s]tates where it has been decriminalized for medical or recreational use." (*Id.* at 2).

---

[13]     The cited page numbers refer to those assigned by CM/ECF.

### iii.     Analysis

The Government's policies do not permit distribution of marijuana. *See, e.g.*, U.S. Dep't of Justice ("DOJ"), Office of the Deputy Attorney General, Guidance Regarding Marijuana Related Financial Crimes (2014) ("DOJ 2014 Mem."); Dep't of the Treasury, Fin. Crimes Enforcement Network, FIN-2014-G001, BSA Expectations Regarding Marijuana-Related Businesses (2014) ("DOT 2014 Mem."); U.S. Dep't of Justice, Office of the Deputy Attorney General, Guidance Regarding Marijuana Enforcement (2013) ("DOJ 2013 Mem."). Nothing in the memoranda Alexander Heying cites supports his argument that the Government permits marijuana to be distributed in states that have legalized marijuana. *See id.* Although the Government has discretion to prioritize some prosecutions over others, the Government's policies described in the memoranda do not

> alter in any way the Department[ of Justice's] authority to enforce federal law, including federal laws relating to marijuana, **regardless of state law**. Neither guidance herein nor any state or local law provides a legal defense to a violation of federal law, including any civil or criminal violation of the [Controlled Substances Act].

DOJ 2013 Mem. at 4 (emphasis added). Instead, the policies describe eight enforcement priorities that guide enforcement of the Controlled Substances Act. *Id.* at 1–2. The DOJ 2013 Memorandum applies to "**all** federal enforcement activity . . . concerning marijuana in **all** states" and "serves as guidance to Department attorneys and law enforcement to focus their enforcement resources and efforts, including prosecution, on persons or organizations whose conduct interferes with any one or more of [the] priorities, **regardless of state law**." *Id.* at 1, 2 (emphasis added). That is, "[t]he primary question in all cases—and in all jurisdictions—should be whether

the conduct at issue implicates one or more of the enforcement priorities." *Id.* at 3.[14] The DOJ

2013 Memorandum demonstrates that regardless of a "legal state purpose," the DOJ still has the

authority to prosecute federal crimes. *See generally id.* Therefore, Alexander Heying's argument

that the marijuana was grown for a legal state purpose does not have any effect on whether the

evidence should be suppressed in a prosecution brought under federal law.

Officer Landreneaux's affidavit is based on aerial surveillance of 2451 Robinson Creek

Road, which showed the cultivation of marijuana. (Landreneaux Aff. at 10–11). Officer

Landreneaux, a law enforcement officer in California, stated that he believed that there was

probable cause that instrumentalities of **federal** crimes involving the manufacture, possession,

and distribution of marijuana, as well as conspiracy of the same activities would be found at

2451 Robinson Creek Road. (*Id.* at 27) (citing 21 U.S.C. §§ 841(a)(1), 846, 856). Alexander

Heying does not specifically challenge whether aerial surveillance is sufficient to constitute

probable cause, or whether the aerial surveillance itself interfered with his legitimate expectation

of privacy. *See generally* (Mot. to Suppress Search at Robinson Creek Road). The United States

Supreme Court has held that, subject to certain conditions that are not in evidence here, "aerial

surveillance of private homes and surrounding areas does not constitute a search." *Kyllo v.*

*United States*, 533 U.S. 27, 33 (2001) (internal citations omitted). The aerial surveillance of 2451

Robinson Creek Road showed that marijuana was cultivated at 2451 Robinson Creek Road.

(Landreneaux Aff. at 10–11). Therefore, Officer Landreneaux's affidavit contained probable

cause—the results of aerial surveillance—sufficient to establish the likelihood that evidence of a

federal crime would be found at 2451 Robinson Creek Road. The Court recommends that

Alexander Heying's Motion to Suppress Search at Robinson Creek Road be denied.

---

[14]     The other memoranda reiterate the guidance provided in 2013 and provide further
guidance regarding marijuana and financial crimes. *See* DOJ 2014 Mem.; DOT 2014 Mem.

### d.     Alexander Heying's Motion to Suppress Search at Bantas Point Lane—October 15, 2012

Alexander Heying moves the Court to suppress the results of a search at 2511 Bantas Point Lane, Minnetonka, Minnesota ("2511 Bantas Point Lane") because he argues there is no nexus between potential contraband and the residence to be searched. (Mot. to Suppress Search at Bantas Point Lane at 1).

### i.     Evidence

Officer John Vinck of the Medina Police Department authored the affidavit in support of the search warrant for 2511 Bantas Point Lane. (Application for Search Warrant & Supporting Affidavit, "Vinck Aff.," Ex. 4, Attached to Gov't's Post-Hearing Summary) [Doc. No. 86-3]. Sgt. Boelter provided the following information to Officer Vinck: Gregory Heying and Jean Heying purchased a residence at 2451 Robinson Creek Road, Ukiah, California, for their son Alexander Heying, and evidence of this purchase and other evidence related to sale of marijuana can be found at their residence at 2511 Bantas Point Lane. (*Id.* at 2). Sgt. Boelter confirmed that Gregory Heying and Jean Heying purchased the residence at 2451 Robinson Creek Road and the residence at 2511 Bantas Point Lane through a law enforcement database. (*Id.*). On September 15, 2005, Sgt. Boelter assisted in the search of 2660 Stone Arch Road, where officers found the following in Alexander Heying's room, who lived there:[15]

> drug paraphernalia, suspected drug notes with names and dollar amounts, two digital gram scales, numerous documents with Alexander Heying's name on them, approx[imately] 55 grams of marijuana and 13 grams of hash, several empty freezer bags with a green leafy substance in them, a lockbox mounted on the wall in the closet [that] contained $2,000 U.S. currency[,] and three keys[.] [O]ne of the keys opened a safe that was found in the attic [containing] $27,560 . . . [and] several containers of marijuana that weighed approx[imately] 8 grams.

---

[15]     The Heyings' father, Gregory Heying, owned 2660 Stone Arch Road. *See* (McGill Aff. at 3).

(*Id.*). In 2009, a cooperating source ("CS-1") told Sgt. Boelter that Alexander Heying's parents bought him a house in Ukiah, California, where Alexander Heying grows marijuana. (*Id.*). CS-1 said Alexander Heying has been transporting hundreds of pounds of marijuana to Minnesota from California, and his brother Peter Heying receives large amounts of marijuana from Alexander Heying. (*Id.*). Additionally, the cooperating source personally observed duffle bags full of marijuana at Peter Heying's residence, 13603 Lake Street Extension. (*Id.*). Alexander Heying told CS-1 he keeps his cash in a safe at his parents' house in Minnetonka, that he lives in the house in Ukiah, California, and that he comes to Minnesota frequently to visit his parents and brother. (*Id.*). In 2011, Peter Heying sold 25 pounds of marijuana to a cooperating source ("CS-2").[16] (*Id.*). On October 8, 2012, Sgt. Boelter found the following items in the garbage taken from 13603 Lake Street Extension:

> three marijuana stems . . . , five partially burnt marijuana cigarettes . . . , an empty box of 60-count Ziploc gallon size bags, three empty packs of Zig Zag rolling papers, an empty hard pack of Camel cigarettes with a green leafy residue in it . . . , and numerous documents and mailings with the name of Peter Heying, 13603 Lake Street Extension, Minnetonka, Minnesota 55345, on them.

(*Id*. at 2–3). The marijuana stems, marijuana cigarettes, and residue on the empty hard pack of Camel cigarettes all field tested positive for marijuana. (*Id*. at 2). Sgt. Boelter learned that 13603 Lake Street Extension is owned by Jean Heying and that Gregory Heying pays the taxes. (*Id*. at 3). Gregory Heying and Jean Heying list 2511 Bantas Point Lane on their driver's licenses. (*Id.*). On October 15, 2012, Sgt. Boelter and others executed a search warrant at 2451 Robinson Creek Road where they found a large marijuana grow operation. (*Id.*). The property included "22 large marijuana plants the size of . . . Christmas trees . . . and a double car garage full of marijuana

---

[16]  Because they provided the same information, the Court assumes the cooperating sources described in the Vinck Affidavit (regarding Bantas Point Lane) are the same as the cooperating sources in the Boelter Affidavit (regarding Lake Street Extension).

which was being dr[i]ed." (*Id.*). Based on Officer Vinck's training, experience, and numerous interviews with drug dealers, he and Sgt. Boelter believed Gregory Heying and Jean Heying were straw buyers for 2451 Robinson Creek Road and that "they [were] keeping records and documents relating to the purchase of the property, money[,] and other evidence at 2511 Bantas Point Lane." (*Id.*). The officers believed Alexander Heying did not have sufficient credit to purchase the residence at 2451 Robinson Creek Road. (*Id.*).

At the hearing, the Government accepted Alexander Heying's offer of proof that he has standing to challenge this search warrant because he spends about ten weeks per year at 2511 Bantas Point Lane. (Tr. at 126:4–15). Alexander Heying also submitted an exhibit, a 20-page report of a DEA investigation in support of standing. (Tr. at 125:17–126:3); (Report of Investigation, the "Report," Ex. AA, Attached to Alexander Heying's Mem. in Supp.) [Doc. No. 100-1].

## ii.     Alexander Heying's Argument

Alexander Heying argues Officer Vinck's affidavit does not "establish the necessary nexus between potential contraband and the residence to be searched." (Alexander Heying's Mot. to Suppress Bantas Point Lane Search at 1) (citing *Tellez*, 217 F.3d at 550). Specifically, Alexander Heying argues nothing in the affidavit suggests Gregory Heying and Jean Heying (Alexander Heying's parents) were involved in drug trafficking or that drug trafficking or other illegal conduct took place at 2511 Bantas Point Lane. (*Id.* at 2–3). Additionally, Alexander Heying argues there is no nexus between his alleged drug trafficking and 2511 Bantas Point Lane. (*Id.*).

### iii.     Analysis

#### a)     Standing

As stated above, Alexander Heying proffered that he spends ten weeks per year at 2511 Bantas Point Lane. (Tr. at 126:4–15). Additionally, the Report shows some documents seized had Alexander Heying's name on them. *See, e.g.*, (Report at 12–14) (listing, *inter alia*, the following as items retrieved from Bantas Point Lane: storage facility lease agreement in the names of Gregory Heying, Jean Heying, and Alexander Heying; State of Minnesota Certificates of Title in Alexander Heying's name; emergency physician's bill in Alexander Heying's name). In response, the Government says, without further argument, "[a]lthough the [Government] does not concede the issue of standing, it nonetheless will address [Alexander Heying's] motion." (Gov't's Resp. to Alexander Heying's Mots. to Suppress at 2).

"Because [F]ourth [A]mendment rights are personal, a person challenging a search warrant must demonstrate that he or she has a legitimate expectation of privacy in the area searched. . . . By establishing a legitimate expectation of privacy, the person establishes his or her standing to challenge the search." *United States v. Wiley*, 847 F.2d 480, 481 (8th Cir. 1988) (internal citation omitted). A casual visitor does not have an expectation of privacy, but an overnight guest does. *See United States v. Perez*, 700 F.2d 1232, 1236 (8th Cir. 1983) (citing, *inter alia*, *Rakas v. Illinois*, 439 U.S. 128, 142–43 (1978)).

The Court finds the facts available demonstrate Alexander Heying had a reasonable expectation of privacy in 2511 Bantas Point Lane because he spent ten weeks per year there, and because he kept at least some of his personal papers there. *See* (Tr. at 126:4–15); (Report at 12–14); *see also United States v. Dickson*, 64 F.3d 409, 410 (8th Cir. 1995) (staying in an apartment for a couple of days was sufficient to find the defendant had standing to challenge a search in

that apartment); *Perez*, 700 F.2d at 1236 (defendant who was an overnight guest with unrestricted access to the residence had standing to challenge search executed pursuant to search warrant).

### b)      Probable Cause and Nexus

Ultimately, Alexander Heying's standing is irrelevant because the search warrant is supported by sufficient probable cause. As stated above, "[p]robable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *Nolen*, 536 F.3d at 839 (internal citations and quotations omitted). Additionally, "there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *Tellez*, 217 F.3d at 550.

Here, the search warrant seeks authority to seize documents and instrumentalities of drug trafficking, such as papers, cell phones, money, ledgers, and bills. (Vinck Aff. at 1). Although Alexander Heying's argument is based on contraband, probable cause is met where either contraband **or** evidence of a crime may be found. *See Nolen*, 536 F.3d at 839 (emphasis added). Sgt. Boelter verified that according to property records, Gregory Heying and Jean Heying owned both the residence at 2511 Bantas Point Lane and the residence at 2451 Robinson Creek Road in California. (*Id.* at 2). Sgt. Boelter had recently learned that 2451 Robinson Creek Road was used in a large marijuana grow operation. (*Id.* at 3). The officers believed Alexander Heying did not have sufficient credit to purchase 2451 Robinson Creek Road. (*Id.* at 3). Gregory Heying and Jean Heying listed 2511 Bantas Point Lane as their residence on their driver's licenses. (*Id.*). Therefore, under the totality of the circumstances, there was probable cause to believe that evidence of a crime—at minimum, papers related to 2451 Robinson Creek Road, where

Alexander Heying lived and which was the location of a large marijuana grow operation—would be found at 2511 Bantas Point Lane, where Gregory Heying and Jean Heying resided. *See Nolen*, 536 F.3d at 839. The Court recommends that Alexander Heying's Motion to Suppress Search at Bantas Point Lane be denied.

## IV.     RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Peter Heying's Motion to Adopt Nonduplicitious Motions of Co-Defendant's [Doc. No. 49] be **GRANTED in part** and **DENIED in part** as follows:

   a.     To the extent Peter Heying moves the Court to join Alexander Heying's Motion to Suppress Search at Stone Arch Road [Doc. No. 61], the Court recommends that Peter Heying's Motion to Join be **GRANTED**; and

   b.     To the extent Peter Heying moves to join any other Defendant's motion to suppress, the Court recommends that Peter Heying's Motion to Join be **DENIED**.

2.     Alexander Heying's Motion to Suppress Results of Administrative Subpoena #0497 to United Parcel Service [Doc. No. 58] be **DENIED as moot**.

3.     Alexander Heying's Motion to Suppress Search and Seizure on March 23, 2003 [Doc. No. 60] be **DENIED**.

4.     Alexander Heying's Motion to Suppress Search and Seizure at Stone Arch Road [Doc. No. 61] be **DENIED** with respect to both Alexander Heying and Peter Heying.

5.      Peter Heying's Motion to Suppress Evidence Obtained as a Result of Search and

Seizures [Doc. No. 46] be **DENIED**;

6.      Alexander Heying's Motion to Suppress Search and Seizure at Robinson Creek

Road, Ukiah [Doc. No. 62] be **DENIED**; and

7.      Alexander Heying's Motion to Suppress Search and Seizure at Bantas Point Lane

[Doc. No. 59] be **DENIED**.


Dated: August 15, 2014

_s/Steven E. Rau_
Steven E. Rau
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **_August 29, 2014_**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.