## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                     **Case No.   14-CR-30 (JRT/SER)**

        Plaintiff,

v.                                            **REPORT AND RECOMMENDATION**

Alexander Edward Heying (1),
Peter Gregory Heying (2), and
Acacia Lauren Ruiz (3),

        Defendants.

    LeeAnn K. Bell, Esq., United States Attorney's Office, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415, for Plaintiff.

    Peter B. Wold, Esq., Wold Morrison Law, 247 3rd Avenue South, Minneapolis, Minnesota 55415, for Defendant Alexander Edward Heying (1).

    Steven T. Grimshaw, Esq., 309 Clifton Avenue, Minneapolis, Minnesota 55403, for Defendant Alexander Edward Heying (1).

    Rachael A. Goldberger, Esq., Rachael Goldberger, PA, 250 2nd Avenue South, Suite 286, Minneapolis, Minnesota 55401, for Defendant Peter Gregory Heying (2).

    Zenia K. Gilg, Esq., Law Office of Zenia K. Gilg, 809 Montgomery Street, 2nd Floor, San Francisco, California 94133, for Defendant Acacia Lauren Ruiz (3).

    Gary R. Wolf, Esq., Wolf Law Office, Suite 205, 250 Second Avenue South, Minneapolis, Minnesota 55401, for Defendant Acacia Lauren Ruiz (3).

STEVEN E. RAU, United States Magistrate Judge

    The above-captioned case comes before the undersigned on Defendant Alexander Edward Heying's (1) Motion to Dismiss Indictment [Doc. No. 56], Defendant Peter Gregory Heying's (2) Motion to Dismiss Indictment as Violative of the United States Constitution (Amendment V, and Article VI/Amendment X), and Request for Evidentiary Hearing [Doc. No.

47], and Defendant Acacia Lauren Ruiz's (3) Motion to Dismiss [Doc. No. 75] (collectively, "Motions to Dismiss"). This matter has been referred to the undersigned for resolution of the issues raised in Alexander Edward Heying's, Peter Gregory Heying's, and Acacia Lauren Ruiz's (the "Defendants") Motions to Dismiss pursuant to 28 U.S.C. § 636(b)(1)(B) and District of Minnesota Local Rule 72.1. For the reasons set forth below, the Court recommends that the Motions to Dismiss be denied.

## I.     BACKGROUND

On February 3, 2014, Plaintiff the United States of America (the "Government") filed an indictment charging Defendants with one count of conspiracy to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 and one count of conspiracy to commit money laundering by promotion in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(h). (Indictment) [Doc. No. 1].

In May 2014, Defendants filed their Motions to Dismiss. Defendants first contend that 21 U.S.C. §§ 812, Schedule 1(c)(10) and Schedule 1(c)(17), which place "[m]arihuana"[1] and

---

[1]     "Marihuana" is defined as

all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16). While Schedule 1(c)(10) uses the term "marihuana," the Court uses the more common spelling, "marijuana," throughout this Report and Recommendation.

"[t]etrahydrocannabinols"[2] on Schedule 1 of the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.*, are unconstitutional. (Mots. to Dismiss at 1).[3] Specifically, Defendants assert that these provisions violate the Equal Protection Clause of the U.S. Constitution because they are over-inclusive in their treatment of marijuana and THC as Schedule 1 controlled substances and because, "when compared to other substances which are legally distributed in the open market, [marijuana] is proven to be far less harmful." (*Id.* at 1–2). As a result, Defendants argue, the "continued prohibition" of marijuana "serves no Government interest." (*Id.* at 2). Defendants also contend that recent policy memoranda that the U.S. Department of Justice and the U.S. Department of the Treasury have issued result in the discriminatory application of the CSA, thereby violating their rights under the Equal Protection Clause as well as the doctrine of equal sovereignty. (*Id.* at 2). Defendants submitted several declarations and numerous exhibits in support of their Motions to Dismiss and moved the Court for an evidentiary hearing at which the proffered evidence and testimony could be presented in support of their claims. (*Id.* at 2–3).

The Government responded to Defendants' Motions to Dismiss, contending that Defendants' claims fail as a matter of law and that an evidentiary hearing is therefore unnecessary. (Mem. in Opp'n to Defs.' Mot. to Dismiss Indictment, "Mem. in Opp'n") [Doc.

---

[2]     Tetrahydrocannabinols ("THC") is the substance from which marijuana "derives its psychoactive properties" and "exists in varying concentration levels in the plant." *Nat'l Org. for Reform of Marijuana Laws (NORML) v. Bell*, 488 F. Supp. 123, 128 (D.C.D.C. 1980). Defendants challenge the provisions of the CSA scheduling marijuana and THC, but consistent with Defendants' argument and briefing, the Court primarily uses the term marijuana. The Court's analysis contained herein applies with equal force to both marijuana and THC.

[3]     Defendants each filed motions to dismiss the indictment, but the motions seek dismissal of the indictment on identical grounds and, based on statements made at oral argument, Defendants Alexander Edward Heying and Peter Gregory Heying rely on the evidence and argument presented by Defendant Acacia Lauren Ruiz. *See also* (Mot. to Dismiss Indictment as Violative of the United States Constitution (Amendment V, and Article VI/Amendment X) at 3). The Court therefore addresses Defendants' Motions to Dismiss collectively, and, for readability, cites only to the relevant pages in Defendant Acacia Lauren Ruiz's Motion to Dismiss.

No. 96]. A pretrial hearing was held at which the parties provided oral argument on the Motions

to Dismiss, and the Court took the matter under advisement on July 17, 2014. (Minute Entry

Dated July 17, 2014) [Doc. No. 118].

## II.    DISCUSSION

### A.    Equal Protection: Classification of Marijuana as a Schedule I Controlled Substance

#### 1.    Subject Matter Jurisdiction

The Court must first consider whether it has subject matter jurisdiction to hear

Defendants' equal protection claim based on the treatment of marijuana as a Schedule I

controlled substance. Although the Government has not explicitly questioned the Court's

jurisdiction, the Government has noted that other courts have declined, on jurisdictional grounds,

to hear claims related to the scheduling of substances under the CSA. (Mem. in Opp'n at 3–4).

Because subject matter jurisdiction relates to the Court's power to consider a claim, the Court

must address the issue. *See United States v. Cotton*, 535 U.S. 625, 630 (2002).

The CSA establishes five schedules of controlled substances, with each schedule based

on different criteria. 21 U.S.C. 812(a)–(b). The Attorney General is permitted to add substances

to these schedules and may also transfer a substance "between such schedules." 21

U.S.C. § 811(a)(1). In addition, the Attorney General may "remove any drug or other substance

from the schedules if he finds that the drug or other substance does not meet the requirements for

inclusion in any schedule." *Id.* § 811(a)(2). The CSA further provides that

> [a]ll final determinations, findings, and conclusions of the Attorney General
> under [ subchapter I of the CSA] shall be final and conclusive decisions of the
> matters involved, except that any person aggrieved by a final decision of the
> Attorney General may obtain review of the decision in the United States Court of
> Appeals for the District of Columbia or for the circuit in which his principal place
> of business is located upon petition filed with the court and delivered to the
> Attorney General within thirty days after notice of the decision.

*Id.* § 877.

The Government cites several cases for the proposition that section 877 prohibits a court from considering a defendant's challenge to a "final . . . scheduling decision[] in a criminal case." (Mem. in Opp'n at 3.). To the extent the Government relies on these cases to suggest that section 877 prohibits this Court from considering Defendants' constitutional challenge to the statutory provisions scheduling marijuana and THC, the Government's argument is unpersuasive. In each of the cases cited by the Government, the defendant brought a challenge to an aspect of an administrative scheduling decision, rather than a constitutional challenge to a statutory scheduling provision.[4] Here, Defendants have made it clear that their challenge is "a constitutional attack on the Congressional Act which criminalizes marijuana." (Reply to Gov't Mem. in Opp'n to Defs.' Mot. to Dismiss Indictment, "Reply") [Doc. No. 106 at 5]. That is, Defendants do not challenge an administrative determination, finding, or conclusion that is subject only to circuit court review. *See* 21 U.S.C. § 877. Instead, Defendants challenge the constitutionality of the statute that forms the basis for the charges alleged in the indictment. This constitutional question falls within this Court's jurisdiction. *Cf. NORML*, 488 F. Supp. at 126 n.2, 141 n.43 (stating that the court had subject matter jurisdiction to evaluate "the constitutional

---

[4]     *See United States v. Forrester*, 616 F.3d 929, 933, 936 (9th Cir. 2010) (declining to address defendant's claim that "the district court erred by failing to allow him to argue that ecstasy should be categorized as a Schedule III, rather than a Schedule I, controlled substance" and describing the claim as an "attempt[] to substantively challenge the AG's ruling"); *United States v. Carlson*, 87 F.3d 440, 446 (11th Cir. 1996) (declining to address defendants' claims that the DEA, to whom the Attorney General has delegated scheduling authority, improperly relied on certain evidence and failed to develop legally acceptable standards for statutory criteria when making a scheduling decision and that the administrative record lacked substantial evidence to support the final scheduling rule); *United States v. Young*, No. 3:09-CR-3(01) RM, 2009 WL 899671, at *1–2 (N.D. Ind. Mar. 30, 2009) (concluding that the court lacked jurisdiction to consider defendant's claim that the DEA had misconstrued and misstated evidence upon which it relied in making a scheduling decision).

legitimacy of the classification of marijuana in Schedule I," while also noting that it "lack[ed] jurisdiction to hear a challenge to an administrative reclassification proceeding").

### 2.      Standard of Review and Legal Standard

Having concluded that the Court has jurisdiction to consider Defendants' equal protection claim challenging the statutory scheduling provisions, the Court must determine the appropriate standard of review. Defendants contend that strict scrutiny should apply to their equal protection claim because the treatment of marijuana as a Schedule I controlled substance targets a suspect class and because it implicates a fundamental right. (Mem. in Supp. at 12–15). Alternatively, Defendants argue that the Court should apply "active" rational basis review in this case. (Mem. in Supp. at 17); (Reply at 15–16). The Government argues that Defendants have failed to establish any basis for the application of strict scrutiny and that Defendants' claim is subject only to rational basis review. (Mem. in Opp'n at 8–12).  The Court considers Defendants' arguments regarding the appropriate standard of review in turn.

### a.      Suspect Classification

A law is subject to strict scrutiny review in an equal protection challenge when, although facially neutral, it was motivated by a discriminatory purpose. *See Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–67 (1977); *see also United States v. Greene*, 995 F.2d 793, 796 (8th Cir. 1993) (noting that "the Supreme Court has repeatedly applied the rational relationship test" to facially-neutral statutes "unless some evidence of purposeful intent to discriminate has been shown"). "Discriminatory purpose implies that the decisionmaker, in this case [Congress], selected or reaffirmed a particular course of action at least in part because of not merely in spite of, its adverse effects upon an identifiable group." *United States v. Clary*, 34 F.3d 709, 712 (8th Cir. 1994) (alteration in original) (internal quotation marks omitted). In

determining whether Congress was motivated by a discriminatory purpose, courts consider several "sources of circumstantial and direct evidence of intent, such as the historical background of Congress's decision, the specific sequence of events preceding the decision, departures from the normal procedural sequence, substantive departures, and legislative or administrative history." *United States v. Carter*, 91 F.3d 1196, 1198 (8th Cir. 1996).

Defendants appear to acknowledge that the CSA is a facially-neutral law, but suggest that the discriminatory impact of marijuana laws demonstrates Congress's discriminatory purpose in placing marijuana on Schedule I of the CSA. (Mem. in Supp. at 12–14). "[A]bsent especially striking circumstances," evidence of disparate impact alone "will not suffice" to show discriminatory purpose. *Britton v. Rogers*, 631 F.2d 572, 577 (8th Cir. 1980). Such cases are "rare" and require a "stark" pattern of disparate impact that is "unexplainable on grounds other than race." *Arlington Heights*, 429 U.S. at 266. To the extent Defendants have provided some evidence of disparate impact, this evidence does not present the type of stark pattern that warrants the conclusion that the disparate impact, by itself, demonstrates discriminatory purpose.[5] *See Gomillion v. Lightfoot*, 364 U.S. 339, 340 (1960) (involving state law that altered city boundaries to exclude all but four or five of 400 black voters "while not removing a single white voter or resident"); *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886) (concluding that discriminatory impact alone was sufficient when permits exempting businesses from effect of ordinance were denied to all 200 Chinese applicants, but granted to 80 other applicants who were not Chinese); *see also Arlington Heights*, 429 U.S. at 266 ("Absent a pattern as stark as that in *Gomillion* or *Yick Wo*, impact alone is not determinative . . .."); *Clary*, 34 F.3d at 711, 714

---

[5]     For example, Defendants offer evidence that "more than half of all federal criminal convictions for marijuana related offenses for the past five years were of Hispanic persons" even though "Hispanics make up just 17% of the U.S. Population." (Decl. of James P. Nolan, III, Ph.D. "Nolan Decl.") [Doc. No. 65 at 7].

(finding no discriminatory purpose despite evidence that "92.6 percent of those convicted of crack cocaine charges were African American"). Thus, the Court must consider whether Defendants have provided any other evidence of discriminatory purpose.

Defendants argue that they have established a discriminatory purpose on the part of Congress based on statements alleged to have been made by Harry Anslinger, former Commissioner of the Federal Bureau of Narcotics. (Mem. in Supp. at 13); (Reply at 3–5). Specifically, Defendants submit that in leading efforts to outlaw marijuana in 1937 through the enactment of the Marijuana Tax Act, Anslinger "characterized marijuana users as drug-addicted and violent, and . . . almost exclusively racial minorities." (Nolan Decl. at 3). Defendants further contend that Anslinger "incorrectly testif[ied] to Congress that a Latino man murdered his entire family due to the influence of 'killer weed'" in hearings that led to the passage of the Marijuana Tax Act and that Anslinger "infamously said '[r]eefer makes darkies think they're as good as white men.'" (*Id.*).

These offensive comments are of minimal evidentiary value, if any, to the question of whether Congress acted with a discriminatory purpose when including marijuana on Schedule I of the CSA.[6] First, Anslinger's purported statements to Congress and general characterization of marijuana users are alleged to have occurred in conjunction with the enactment of the Marijuana Tax Act, a different piece of legislation that was adopted by Congress more than 30 years prior to the passage of the CSA in 1970. *McCleskey v. Kemp*, 481 U.S. 279, 298 n. 20 (1987) (noting that "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value"); *see also United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994)

---

[6]     While the Court concludes that Anslinger's alleged statements do not warrant the conclusion that Congress acted with a discriminatory purpose when it included marijuana in the CSA, the Court does not hesitate to condemn such statements as patently offensive.

(concluding that "racism that animated legislative debate leading to the passage of a 1914 statute" was "of no relevance" to the court's inquiry into the motives behind Congressional action in 1986); *NORML*, 488 F. Supp. at 126–27 (discussing Congress's adoption of the CSA).

Second, while Defendants claim that Anslinger "infamously" made a racist comment regarding marijuana users, Defendants do not assert that this comment was made before Congress during their consideration of the CSA, or any other legislation, for that matter. *Cf. Clary*, 34 F.3d at 713 (questioning the district court's reliance on "media-created stereotypes of crack dealers" presented to Congress because Congressional consideration of the materials "hardly demonstrate[d] that the stereotypical images 'undoubtedly' influenced the legislators' racial perceptions"). Moreover, Anslinger was not a "member[] of the decisionmaking body" that enacted the CSA, and Defendants have not provided the Court with any other reason to attribute Anslinger's views to a legislative body constituted several decades after those views were allegedly articulated. *See Arlington Heights*, 429 U.S. at 268.

Defendants also point to statements made by Congressman Steve Cohen during a March 4, 2014, hearing as evidence of discriminatory purpose. (Nolan Decl. at 4–5). In his hearing testimony, Congressman Cohen stated that President Richard Nixon, as well as President Nixon's White House Counsel and Chief of Staff, made statements indicating that discriminatory motives drove the administration's support of the CSA. These statements fail to provide sufficient evidence that Congress acted with discriminatory purpose in scheduling marijuana as a Schedule I substance. Like Anslinger, President Nixon and the identified members of his administration were not members of the decision-making body that enacted the CSA, nor do Defendants provide the Court with any basis to impute the alleged discriminatory intent to Congress.

Defendants assert that any "official" action related to the criminalization of marijuana under the CSA is relevant to the Court's inquiry into discriminatory purpose, and that the Supreme Court "has not articulated a rule that Congress alone must have had an invidious intent." (Reply at 17). Defendants cite several cases in this regard, none supporting their argument. While these cases refer to official action, rather than Congressional action, they do so only generally and in the course of evaluating the constitutionality of actions taken not by Congress, but by other various government officials or entities. *See Arlington Heights*, 429 U.S. at 254, 254 n.1 (involving a challenge to a decision of the Village of Arlington Heights "and a number of its officials"); *Washington v. Davis*, 426 U.S. 229, 232 (1976) (involving a challenge to actions taken by law enforcement officials); *see also Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (noting that intent of the decision-maker, "a state legislature," was at issue). The cases Defendants cite merely support the unremarkable proposition that when determining whether a particular official action was motivated by discriminatory intent, the court must determine the intent of the decision-making body that engaged in the challenged official action. The Court does so here.

Defendants go on to argue that President Nixon's "express statements" regarding the discriminatory purpose motivating his "official action" of "recommending marijuana's inclusion" in the CSA demonstrates a discriminatory purpose behind the CSA's treatment of marijuana as a Schedule I controlled substance. (Reply at 17–18). But Defendants do not contend that President Nixon's official act of recommending the inclusion of marijuana in the CSA is the official act that has denied them equal protection of the laws. Rather, they challenge "the Congressional Act which criminalizes marijuana." (Reply at 5). Again, the appropriate inquiry is

one regarding the intent of the decision-maker whose actions have been challenged, which is, in this case, Congress.

Finally, although not explicitly relied on in the course of their argument regarding discriminatory purpose, Defendants have referred to the fact that Congress initially placed marijuana on Schedule I on a temporary basis and declined to change its scheduling decision based on a subsequent report. *See* (Mem. in Supp. at 6–8); (Reply at 3–5). The report, entitled "Marihuana: A Signal of Misunderstanding," was generated by the National Commission on Marihuana and Drug Abuse (the "Commission") in 1972.[7] (Mem. in Supp. at 7–8). Defendants state that the report "recommended the decriminalization of marijuana" and suggest that Congress's failure to take steps to decriminalize marijuana is evidence of its discriminatory purpose. *See* (Mem. in Supp. at 8); (Reply at 5). This argument is unpersuasive.

Congress's decision to schedule marijuana on a temporary basis pending additional Commission study was in recognition of the fact that there was "a considerable void" regarding "knowledge of the plant and effects of the active drug contained in it." (H.R. Rep. 91-1444, Ex. D, Attached to Mem. in Supp.) [Doc. No. 76-5]. This reflects a measured approach on the part of Congress, rather than a hasty decision motivated by racial animus. Also, while Defendants state, without qualification, that the report called for the decriminalization of marijuana, this is simply not the case. In fact, "[r]ecognizing the relationship of large scale sale of marijuana to a serious public health problem, the . . . Commission recommended that sale of marijuana remain a felony" and recommended that Congress only abrogate "criminal sanctions for possession of marijuana in private and for casual distribution of small amounts of marijuana" for little or no

---

[7]    "In an effort to secure more information about marijuana, Congress . . . established the Commission" and asked the Commission "to study marijuana use and its effects." *NORML*, 488 F. Supp. at 135 n.32.

remuneration. *Roush v. White*, 389 F. Supp. 396, 404, 404 n.4 (N.D. Ohio 1975); *see also NORML*, 488 F.Supp. at 135 n.32. Thus, the continued treatment of marijuana as a Schedule I substance is not undermined by the report in the manner that Defendants suggest and provides no evidence of discriminatory Congressional motives.

Defendants ask this Court to "ascribe a discriminatory intent to Congress based on rather sketchy and unpersuasive bits of information." *Johnson*, 40 F.3d at 440. They have failed to provide sufficient evidence that Congress acted with discriminatory purpose when scheduling marijuana under the CSA and are therefore not entitled to strict scrutiny on this basis.

### b.      Fundamental Right

Defendants also contend that strict scrutiny is warranted because their fundamental right to liberty is at stake in this criminal prosecution. (Mem. in Supp. at 15). Specifically, Defendants argue that because they challenge the constitutionality of the statute that is the basis for the charges against them, their challenge "directly implicates" their "fundamental right to be free from incarceration." (Reply at 19–20). In response, the Government notes that a criminal defendant's liberty interests are protected by numerous constitutional provisions related to criminal prosecutions and that a defendant must demonstrate that a criminal statute infringes upon a fundamental right, beyond the right to liberty, before strict scrutiny applies. *See* (Mem. in Opp'n at 10–11).

"Every person has a fundamental right to liberty in the sense that the Government may not punish him unless and until it proves his guilt beyond a reasonable doubt at a criminal trial conducted in accordance with the relevant constitutional guarantees." *Chapman v. United States*, 500 U.S. 453, 465 (1991). In *Chapman*, the Supreme Court rejected the petitioners' argument that because "the right to be free from deprivations of liberty as a result of arbitrary sentences is

fundamental . . . the statutory provision at issue" could "be upheld only if" it survived strict scrutiny. *Id.* at 464–65. Although *Chapman* involved a challenge to statutory provisions determining the petitioners' sentences rather than to the statute defining their offense, *Chapman* reflects the principle that the constitutional guarantees necessarily involved in the criminal process vindicate a defendant's liberty interest. *See id.* Thus, unless the criminal prosecution implicates some other fundamental right, only rational basis review is required. *See id.*[8]

Defendants rely on *Washington v. Glucksberg*, 521 U.S. 702 (1997), in support of their argument that they are entitled to strict scrutiny, but that decision provides no support for the application of strict scrutiny to any criminal law for which conviction leads to a loss of liberty. In fact, *Glucksberg* suggests the opposite. The Supreme Court in *Glucksberg* considered the constitutionality of a statute that made "promoting a suicide attempt" a felony, punishable by up to five years' imprisonment. 521 U.S. at 707 (internal quotations marks omitted). After considering whether there is a fundamental right "to commit suicide which itself includes a right to assistance in doing so," the Court concluded that no such fundamental right existed and applied rational basis review to the criminal statute in question. *Id.* at 723–28. If the deprivation of liberty threatened by prosecution under the statute was, by itself, sufficient to invoke strict scrutiny, the Court's lengthy and detailed analysis of whether assistance in committing suicide was a fundamental right would have been entirely unnecessary. Other cases Defendants rely on

---

[8]    *See also Johnson*, 40 F.3d at 439 n.1 (D.C. Cir. 1994) (concluding that asserted general liberty interests "bear no relation to the fundamental 'rights' at stake in cases" involving the right to education or the right to marriage and procreation, "interests which represented more than just the manufactured right to be free from the very punishment in the core equal protection challenge"); *United States v. Jenkins*, 909 F. Supp. 2d 758, 776 (E.D. Ky. 2012) (rejecting defendants' claim that "a special fundamental right of liberty [was] at stake" in their prosecution because "criminal statutes are not per se subject to strict scrutiny"); *United States v. Dixon*, 619 F. Supp. 1399, 1401 (S.D.N.Y. 1985) (rejecting defendant's argument that "strict scrutiny must be applied to criminal statutes that affect vital liberty interests such as those present in criminal cases" (internal quotation marks omitted)).

also fail to support their argument or involve protection of liberty interests in the context of civil, rather than criminal confinement. *See* (Mem. in Supp. at 15); (Reply at 18–21).

In addition, several courts, including the Eighth Circuit, have applied rational basis review to similar, if not the same, constitutional challenges as Defendants' challenge. *See, e.g.*, *United States v. Fogarty*, 692 F.2d 542, 547–48 (8th Cir. 1982); *United States v. Kiffer*, 477 F.2d 349, 353–57 (2nd Cir. 1973); *United States v. Washington*, 887 F. Supp. 2d 1077, 1102 (D. Mont. 2012); *United States v. Maiden*, 355 F. Supp. 743, 747–48 (D. Conn. 1973).

The Court declines Defendants' invitation to expand, almost without limit, the application of strict scrutiny review to criminal statutes and concludes that no fundamental right is at issue in this case.

### c.    Active Rational Basis Review

In addition to seeking strict scrutiny review, Defendants ask the Court to apply "active" rational basis review to their equal protection claim, arguing that recent Supreme Court decisions support the application of this level of review to equal protection claims involving federalism concerns. (Mem. in Supp. at 17); (Reply at 15–16). In support of their contention, Defendants cite *Shelby County v. Holder*, 133 S. Ct. 2612 (2013) and *United States v. Windsor*, 133 S. Ct. 2675 (2012).

*Shelby County* involved review of the Voting Rights Act and Congress's unique and "unprecedented" exercise of authority over state and local voting laws under the Act. 133 S. Ct. at 2624–25. *Windsor* involved review of the Defense of Marriage Act's definition of marriage, which intruded upon state authority over domestic relations law. 133 S. Ct. at 2691–92. The CSA does not interfere with state voting laws or state domestic relations law, and to the extent these cases apply a more "active" form of rational basis review, Defendants do not provide the Court

with analysis explaining why the federalism concerns involved in *Shelby County* and *Windsor* are equivalent to any federalism issues raised by Defendants here.[9] Nor can the Court independently find a basis for equating the issues in *Shelby County* and *Windsor* with those at issue in this case.

Moreover, to the extent Defendants contend that active rational basis review is warranted in cases involving "unusual" classifications, their argument is without merit. *See* (Mem. in Supp. at 17) (quoting *Romer v. Evans*, 517 U.S. 620, 633 (1996)). Assuming again that the Supreme Court has established "some form of heightened rational basis review" in this context, the Eighth Circuit has held that this heightened form of review "only applies where there is no other legitimate . . . interest for the legislation that survives scrutiny," suggesting that the law is "the product solely of animus." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1020–21 (8th Cir. 2012). As discussed below, the treatment of marijuana as a Schedule I substance is based on a legitimate      interest      that      survives      scrutiny,      so      it      does      not "fall within the *Romer* ambit." *Id.*

Because the Court concludes no discriminatory legislative purpose motivated the inclusion of marijuana as a Schedule I controlled substance, Defendants' prosecution does not implicate a fundamental right, and active rational basis review is not warranted in this case, rational basis is the appropriate standard of review. *See United States v. Blumberg*, 961 F.2d 787, 789 (8th Cir. 1992).

### d.    Rational Basis Review

The Equal Protection Clause of the Fourteenth Amendment, made applicable to the federal government via the Fifth Amendment Due Process Clause, provides that the government

---

[9]      *See infra*, pages 30–33 for a discussion of Defendants' equal sovereignty claim.

shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. Under the rational basis test, a classification "cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller v. Doe*, 509 U.S. 312, 320 (1993). The classification is entitled to "a strong presumption of validity" and the party "attacking the legislative arrangement" bears the burden of negating "every conceivable basis which might support it." *Id.* at 319–20 (internal quotation marks omitted); *see also United States v. Thomas*, 628 F.3d 64, 70–71 (2d Cir. 2010). The government "has no obligation to produce evidence to sustain the rationality of a statutory classification." *Heller*, 509 U.S. at 320. Further, rational basis review is a "highly deferential standard" under which a court may not "judge the wisdom or desirability" of legislative choices. *Fogarty*, 692 F.2d at 547 (internal quotation marks omitted).

### 3.    Analysis

Applying rational basis review to the statutory provisions classifying marijuana and THC as a Schedule I controlled substances, it is clear that they pass constitutional muster. Defendants argue 21 U.S.C. § 812, Schedule 1(c)(10) and Schedule 1(c)(17) are over-inclusive given the statutory requirements for inclusion in Schedule 1 and also suggest that the statute is under-inclusive given the harm posed by other substances, some of which are not controlled under the CSA. *See* (Mots. to Dismiss at 1-2). With regard to under-inclusiveness, Defendants compare marijuana to alcohol and tobacco, several over-the-counter medications, and prescription medications more generally. (Mem. in Supp. at 20–24). Defendants argue that the harms associated with these substances are greater than those posed by marijuana, demonstrating the irrationality of the CSA's treatment of marijuana as a Schedule I substance. (*Id.* at 23–24).

In *NORML v. Bell*, 488 F. Supp. 123, the court addressed the same essential argument. The court noted that it is fundamental that Congress has "wide discretion in attacking social ills" and that "[f]ailure to address a certain problem in an otherwise comprehensive legislative scheme is not fatal to the legislative plan." *Id.* at 137. Congress may "'direct its law against what it deems the evil as it actually exists without covering the whole field of possible abuses, and it may do so none the less that the forbidden act does not differ in kind from those that are allowed.'" *Id.* (quoting *Hughes v. Superior Court*, 339 U.S. 460, 468 (1950)).

In light of the "legislative freedom in confronting social problems," the court concluded that the fact that the CSA does not cover alcohol and tobacco did not "render the scheme unconstitutional." *Id.* at 138. In doing so, the court noted that the fact that "alcohol and tobacco may have adverse effects on health does not mean the CSA is the only proper means of regulating these drugs, nor does it mean that marijuana should be treated identically." *Id.* Indeed, factors such as the existence of other legislative schemes regulating a substance, the degree to which the dangers of a substance are understood, "'the adverse consequences of prohibition, and the economic significance of their production'" may warrant Congress's different treatment of different substances. *See id.* at 138, 138 n.36 (quoting *Maiden*, 355 F. Supp. at 74–48). Defendants have failed to demonstrate that these varied considerations do not provide a conceivable basis for Congress's disparate treatment of marijuana and alcohol and tobacco or marijuana and the over-the-counter and prescription drugs to which it has been compared. And given the latitude afforded Congress in addressing social ills, the CSA's treatment of marijuana is "not rendered irrational . . . because other drugs with capacity for harm are not prohibited." *Maiden*, 355 F. Supp. at 747–48; *see also Fogarty*, 692 F.2d at 548, 548 n.4 (citing both *NORML* and *Maiden* with approval).

17

Like Defendants' argument based on under-inclusiveness, their argument based on over-inclusiveness is without merit. As Defendants do here, the plaintiff in *NORML* argued that marijuana's presence on Schedule I of the CSA was over-inclusive because marijuana does not satisfy any of the requirements for inclusion in that schedule.[10] 488 F. Supp. at 139. In rejecting this claim, the court first noted disagreement over whether marijuana meets the criteria for Schedule I. *Id.* at 140. But the court concluded that the treatment of marijuana as a Schedule I substance was rationally related to Congress's legitimate regulatory interests reflected in the CSA, noting that even if

> marijuana does not fall within a literal reading of Schedule I, the classification still is rational. Placing marijuana in Schedule I furthered the regulatory purposes of Congress. The statutory criteria of section 812(b)(1) are guides in determining the schedule to which a drug belongs, but they are not dispositive. Indeed, the classifications at times cannot be followed consistently, and some conflict exists as to the main factor in classifying a drug potential for abuse or possible medical use.

*Id.* (footnote omitted).

Similarly, the Eighth Circuit reasoned in *Fogarty* that "ongoing vigorous dispute as to the physical and psychological effects of marijuana, its potential for abuse, and whether it has any medical value, supports the rationality of continued Schedule I classification." 692 F.2d at 548. Moreover, the court noted, "the three statutory criteria for Schedule I classification . . . should not be read as being either cumulative or exclusive." *Id.* (footnote omitted). Thus, even assuming that marijuana has some accepted medical use, the "Schedule I classification may nevertheless be rational in view of countervailing factors such as the current pattern, scope, and significance of marijuana abuse and the risk it poses to public health." *Id.* (citing 21 U.S.C. § 811(c)(1)–(8)).

---

[10]    The requirements for inclusion on Schedule I are: 1) "The drug or other substance has a high potential for abuse"; 2) "The drug or other substance has no currently accepted medical use in treatment in the United States"; and 3) "There is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1)(A)–(C).

As these cases make clear, the inclusion of marijuana on Schedule I of the CSA withstands rational basis review. While Defendants urge that additional scientific evidence not considered by the courts in *NORML*, *Maiden*, and *Fogarty* is now available and demands the conclusion that marijuana's continued treatment as a Schedule I substance lacks a rational basis, Defendants' behests ignore the deferential nature of the Court's review.

Defendants have offered the Court several declarations in support of their argument, some of which speak to the current state of scientific evidence regarding marijuana. But these declarations themselves demonstrate that there remains a rational basis for the classification of marijuana as a Schedule I substance. For example, in the proffered testimony of Dr. Carl Hart ("Dr. Hart"), he states that "[m]arijuana's dependence liability or risk of addiction is presently disputed within the medical and scientific community." (Direct Examination of Carl Hart, Ph.D., Attached to Supplemental Ex. X in Supp. of Mot. to Dismiss, "Hart Examination")  [Doc. No. 117-1 at 8]. He also states that "the majority of" his colleagues accept marijuana as having medical value, necessitating the conclusion that a minority of his colleagues have not adopted such a view. (*Id.* at 9). As in *Fogarty*, these ongoing disputes "support[] the rationality of the continued Schedule I classification." 692 F.2d at 548; *see also Washington*, 887 F. Supp. 2d at 1102–03 ("Although [defendant] argues that . . . additional studies and changes in state law have called into question the rationality of Congress's policy, there remains sufficient debate regarding the public benefits and potential for harmful consequences of marijuana use to find a rational basis to uphold the continued classification of marijuana as a schedule I controlled substance.").

Similarly, Dr. Phillip A. Denney ("Dr. Denney") states that "the overwhelming majority of current medical research contradicts" marijuana's treatment as a Schedule I substance, and

both Dr. Denney and Dr. Hart weigh in on the credibility and persuasive value of studies regarding the use of marijuana and its effects. *See* (Decl. of Phillip A. Denney, M.D.) [Doc. No. 64 at 2, 3, 7]; (Hart Examination at 10–11). But rational basis review does not permit "'the judiciary . . . to sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'" *Fogarty*, 692 F.2d at 547 (quoting *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)). Indeed, in the course of rational basis review, "'legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.'" *Heller*, 509 U.S. at 320 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993)). Judicial deference is especially warranted here where "the challenged classification entails legislative judgments on a whole host of controversial medical, scientific, and social issues." *Fogarty*, 692 F.2d at 547. For the same reasons discussed above, to the extent Defendants argue more generally that the treatment of marijuana as a controlled substance (Schedule I or otherwise) is without a rational basis, their argument fails. "Given the continuing debate over marijuana, this court must defer to the legislature's judgments on disputed factual issues." *NORML*, 488 F.Supp. at 136. Finally, to the extent Defendants rely on various federal polices related to the enforcement of the CSA to demonstrate the irrationality of marijuana's inclusion on Schedule I, the Court concludes that their reliance is unpersuasive. These federal policies are discussed at length below and do not undermine the rationality of marijuana's status under the CSA.

The Court notes that since the 1970s, numerous parties have raised constitutional challenges related to marijuana's status as a Schedule I controlled substance, none of which have

been successful.[11] Since the 1970s, marijuana's status under federal law has been a fiercely debated issue and it remains one today. While scientific advances may now provide more information regarding the effects of marijuana, these advances simply do not resolve the legal issue before the Court—that is, whether Congress has a rational basis for treating marijuana as a Schedule I controlled substance.

The Court has reviewed the extensive evidence proffered by Defendants in support of their Motions to Dismiss, but Defendants failed to offer evidence that could negate every conceivable basis for the treatment of marijuana as a Schedule I controlled substance. As a result, Defendants' are not entitled to an evidentiary hearing or dismissal of the indictment on their equal protection claim.

### B.       Equal Protection: Selective Prosecution

#### 1.       Legal Standard

A defendant raising a selective prosecution claim "asks a court to exercise judicial power over a 'special province' of the Executive." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). This special province consists of the exercise of broad prosecutorial discretion with regard to the enforcement of criminal laws. *Id.* A presumption of regularity attaches to prosecutorial decision-making and, "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." *Id.* (internal quotation marks omitted). "In the ordinary case, 'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by

---

[11]      *See, e.g.*, *United States v. White Plume*, 447 F.3d 1067, 1074–76 (8th Cir. 2006); *Fogarty*, 692 F.2d at 547–48; *Kiffer*, 477 F.2d at 353–57; *Washington*, 887 F. Supp. 2d at 1102–03; *NORML*, 488 F. Supp. at 134–41; *Maiden*, 355 F. Supp. at 747–48; *United States v. Zhuta*, No. 09CR357A, 2010 WL 5636212, at *3–4 (W.D.N.Y. Oct. 29, 2010).

statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *Id.* (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

Courts proceed cautiously when examining the decision whether to prosecute, due in part to "the relative competence of prosecutors and courts" in considering factors that bear on such a decision. *Id.* at 465. That is, courts are not well-equipped to engage in an analysis of the strength of a particular case, a case's "general deterrence value," government enforcement priorities, and the relationship between a particular case and overarching enforcement plans. *Id.*

Prosecutorial discretion is, however, subject to constitutional limitations. *Id.* at 464. One such limitation is the Equal Protection Clause, which prohibits prosecutorial decision-making based on "'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Id.* (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Thus, rooted in equal protection principles, the elements of a selective prosecution claim "draw on 'ordinary equal protection standards.'" *Id.* at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). Specifically, a defendant must show that a prosecutorial policy had a discriminatory effect and that the policy was motivated by a discriminatory purpose. *Id.* In order to establish discriminatory effect, a defendant must show that similarly situated individuals were not prosecuted. *Id.*; *United States v. Hirsch*, 360 F.3d 860, 864 (8th Cir. 2004). The burden of establishing the elements of a selective prosecution claim "falls heavily on the defendant," *United States v. Wilson*, 806 F.2d 171, 176 (8th Cir. 1986), and to obtain an evidentiary hearing the defendant "must present some evidence that tends to show the existence of both elements." *United States v. Peterson*, 652 F.3d 979, 982 (8th Cir. 2011) (internal quotation marks omitted).

2.        **Analysis**

At first blush, Defendants' selective prosecution claim may appear to have some merit. But, as discussed below, Defendants' claim is premised on a superficial analysis of several policy memoranda related to the federal government's enforcement of the CSA. *See* (Mem. in Supp. at 42–43). Moreover, Defendants' arguments suggest that they may prove selective prosecution merely by showing prosecutorial action that has the potential to result in some different treatment. *See* (*id.*). To succeed on a successful selective prosecution claim, however, requires a much greater showing: discriminatory effect and discriminatory purpose. *Armstrong*, 517 U.S. at 465. Defendants have failed to establish either element of their claim.

a.        **Discriminatory Effect**

Defendants have failed to present any evidence that similarly situated individuals were not prosecuted. Defendants assert that a memorandum issued by the U.S. Department of Justice has resulted in the discriminatory enforcement of the CSA based on an arbitrary classification: individuals who distribute marijuana in states that have legalized the distribution of marijuana are no longer prosecuted while individuals who distribute marijuana in states that continue to prohibit its distribution continue to be prosecuted under federal law. (Mem. in Supp. at 42) (citing U.S. Dep't of Justice, Office of the Deputy Attorney General, Guidance Regarding Marijuana Enforcement (2013) (the "Cole Memo")).[12]

Defendants initially assert that to succeed on a claim of selective prosecution, "the compared groups need not be similarly situated," and cite *Armstrong*, 517 U.S. at 465, for this proposition. (Mem. in Supp. at 41). *Armstrong*, however, rejected such a rule. *See Armstrong*,

---

[12]    The Cole Memo was also submitted to the Court as Exhibit A in support of Defendants' Motions to Dismiss. (Cole Memo, Ex. A, Attached to Mem. in Supp.) [Doc. No. 76-2].

517 U.S. at 467–69 ("The Court of Appeals held that a defendant may establish a colorable basis for discriminatory effect without evidence that the Government has failed to prosecute others who are **similarly situated** to the defendant. We think it was mistaken in this view." (emphasis added) (citation omitted)). The Court left open the question of whether a defendant must "satisfy the similarly situated requirement" when prosecutors directly admit a discriminatory purpose, *id.* at 469 n.3, a circumstance not presented in this case. Perhaps anticipating their problematic reliance on *Armstrong*, Defendants alternatively contend that they are similarly situated to those that are "protected" from prosecution pursuant to the Cole Memo because, like Defendants, those protected from prosecution are also conspiring to distribute marijuana under 21 U.S.C. § 846. (Mem. in Supp. at 42 n.38).

The Court questions Defendants' blanket assertion that all individuals that engage in conduct meeting the statutory definition of conspiracy to distribute marijuana are similarly situated. Generally, a court must consider whether a defendant has been "treated differently than other persons who were 'in all relevant respects similarly situated.'" *Flowers v. City of Minneapolis, Minn.*, 558 F.3d 794, 798 (8th Cir. 2009) (quoting *Bills v. Dahm*, 32 F.3d 333, 335 (8th Cir. 1994)). "Defendants are similarly situated when their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Venable*, 666 F.3d 893, 900–01 (4th Cir. 2012); *United States v. Holthusen*, No. 13-71 (RHK/LIB), slip op. at 12 (D. Minn. Oct. 31, 2013) (citing *Venable*, 666 F.3d at 900–01); *see also United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000) (holding that individuals are similarly situated for purposes of a selective prosecution claim when, among other requirements, they "committed the same basic crime in substantially the same manner as the defendant . . . so that any prosecution of that individual would have the

same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan").

Several distinct and legitimate prosecutorial factors may justify different prosecutorial decisions with regard to individuals conspiring to distribute marijuana in a state where marijuana is illegal under state law in contrast to individuals conspiring to distribute marijuana in a state where certain marijuana-related activity has been legalized. These factors include the extent to which the prosecution would serve federal enforcement priorities, the constraints imposed by limits on prosecutorial resources, and the deterrent effect of the prosecution. *See Venable*, 666 F.3d at 900-01; *see also Armstrong*, 517 U.S. at 465. Indeed, the Cole Memo explicitly refers to such factors. The memorandum addresses federal enforcement priorities regarding marijuana-related activity and states that the enforcement priorities are designed to use "limited investigative and prosecutorial resources to address the most significant threats in the most effective, consistent, and rational way." Cole Memo at 1.

Even assuming, *arguendo*, that Defendants and all individuals conspiring to distribute marijuana in states where such activity has been legalized are similarly situated, Defendants have failed to offer any evidence that such individuals have not been prosecuted. Instead, in conclusory fashion, Defendants allege that, pursuant to the Cole Memo, "marijuana distribution with state approval is protected from federal prosecution." (Mem. in Supp. at 42 n.38). But nothing in the memorandum exempts from federal prosecution those engaged in the distribution of marijuana in states where marijuana has been legalized, nor does it exempt from prosecution those engaged in the distribution of marijuana in a manner that is consistent with state law. Rather, the Cole Memo describes eight enforcement priorities that guide enforcement of the

CSA. Cole Memo at 1.[13] The priorities apply to "**all** federal enforcement activity . . . concerning marijuana in **all** states" and "serve as guidance to Department attorneys and law enforcement to focus their enforcement, including prosecution, on persons or organizations whose conduct interferes with any one or more of [the] priorities, **regardless of state law**." *Id.* at 1, 2 (emphasis added). That is, the "primary question in all cases—and in all jurisdictions—[is] whether the conduct at issue implicates one or more of the enforcement priorities." *Id.* at 2. Moreover, the Cole Memo states that it "does not alter in any way the Department's authority to enforce federal law" and that neither the guidance provided therein "nor any state or local law provides a legal defense to a violation of federal law." *Id.* at 4; *see also* Report and Recommendation Dated Mar. 24, 2014, *United States v. Keller*, No. 12-cr-200883 (KHV/JPO) (D. Kan.) [Doc. No. 1233 at 7] (concluding that the Cole Memo "does not exempt any individuals from prosecution, even where there is clear and unambiguous compliance with state laws").

Although not relied on by Defendants explicitly in their selective prosecution argument, Defendants provided the Court with several additional documents bearing on federal prosecutorial policy regarding marijuana-related activity. The first of these documents is a U.S. Department of the Treasury memorandum. U.S. Dep't of the Treasury, Financial Crimes Enforcement Network, FIN-2014-G001, BSA Expectations Regarding Marijuana-Related

---

[13]    The enforcement priorities are: preventing "the distribution of marijuana to minors"; preventing revenue from marijuana sales "from going to criminal enterprises, gangs, and cartels";  preventing "the diversion of marijuana from states where it is legal under state law in some form to other states"; preventing "state-authorized marijuana activity from being used as a cover or pretext for the trafficking of other illegal drugs or other illegal activity"; preventing "violence and the use of firearms in the cultivation and distribution of marijuana"; preventing "drugged driving and the exacerbation of other adverse public health consequences associated with marijuana use"; preventing "the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by marijuana production on public lands"; and preventing the use or possession of marijuana on federal property. Cole Memo at 1–2.

Businesses (2014) (the "Treasury Memo").[14] The Treasury Memo provides guidance to financial institutions that engage in transactions involving marijuana-related businesses. Treasury Memo at 1. Specifically, the Treasury Memo provides financial institutions with instruction on how they should file suspicious activity reports ("SARs") regarding transactions with marijuana-related businesses in a manner that "facilitates law enforcement's access to information pertinent to" federal enforcement priorities. *Id*. at 3. The Treasury Memo outlines the different categories of SARs that financial institutions should file based on whether a business's activities implicate federal enforcement priorities or violate state law, but "[t]he obligation to file a SAR is unaffected by any state law that legalizes marijuana-related activity." *Id.* at 3. In addition, a Department of Justice memorandum, also referred to by Defendants, was issued concurrently with the Treasury Memo and clarifies that prosecutors should consider the same enforcement priorities articulated in the Cole Memo when making charging decisions with respect to "certain financial crimes for which marijuana-related conduct is a predicate." U.S. Dep't of Justice, Office of the Deputy Attorney General, Guidance Regarding Marijuana Related Financial Crimes 2 (2014) (the "Financial Crimes Memo").[15] Therefore, like the Cole Memo, the Treasury Memo and Financial Crimes Memo are fundamentally related to effectuating the federal government's enforcement priorities and do not exempt any individuals or institutions from federal prosecution.

---

[14]    The Treasury Memo was also submitted to the Court as Exhibit B in support of Defendants' Motions to Dismiss. (Treasury Memo, Ex. B, Attached to Mem. in Supp.) [Doc. No. 76-3].

[15]    The Financial Crimes Memo was also submitted to the Court as Exhibit C in support of Defendants' Motions to Dismiss. (Financial Crimes Memo, Ex. C., Attached to Mem. in Supp.) [Doc. No. 76-4].

In sum, the memoranda Defendants rely upon do not support their assertion that individuals conspiring to distribute marijuana in states where marijuana is legal are exempt from federal prosecution, nor have Defendants offered any other evidence that such individuals have not been prosecuted.[16] Thus, Defendants have failed to meet their burden to offer some evidence that the relevant prosecutorial policies have had a discriminatory effect.

### b.    Discriminatory Purpose

The fact that Defendants have failed to offer any evidence of discriminatory effect disposes of their selective prosecution claim. *See United States v. Leathers*, 354 F.3d 955, 963 (8th Cir. 2004) (noting that a defendant must show both discriminatory effect and discriminatory purpose to prevail on a selective prosecution claim). The Court concludes, however, that Defendants have also failed to offer any evidence of discriminatory purpose. To establish discriminatory purpose, a defendant must show "a constitutionally impermissible motive prompting the prosecution." *Id*. Defendants appear to contend that the Cole Memo sets forth a prosecutorial policy based on an impermissible motive because it arbitrarily and irrationally puts a stop to the prosecution of individuals distributing marijuana in states where it is legal. (Mem. in Supp. at 42–43). Defendants argue that there is no rational reason for the government to refrain from such prosecutions in light of marijuana's status as a Schedule I substance, and that the "rational response" would be to increase enforcement of the CSA in states where marijuana has been legalized. (*Id.* at 43).

---

[16]    Defendants have directed the Court's attention to an announcement in which the Veterans Administration Eastern Colorado Healthcare System declared that the use of "state-approved marijuana would not disqualify a veteran for healthcare, nor result in any sort of retaliation or denial of services." (Mem. in Supp. at 4). Like the policy memoranda discussed above, nothing about this Veterans Administration policy announcement regarding the availability of medical care exempts any individual from federal prosecution, nor do Defendants' offer a clear explanation of how access to medical benefits for Colorado veterans relates to their prosecution.

Once again, however, Defendants' argument is premised on an inaccurate characterization of the Cole Memo. As discussed above, the Cole Memo and related memoranda do not exempt from prosecution those involved in the distribution of marijuana in states where such activity is authorized under state law. *See* Cole Memo; Treasury Memo; Financial Crimes Memo. Instead, they articulate several broad enforcement priorities that are intended to inform charging decisions regarding marijuana-related crimes and focus prosecutorial efforts on marijuana-related activities that implicate the most significant dangers associated with marijuana, regardless of where those activities occur. The establishment of these priorities and enforcement of the law in accordance therewith are entirely rational exercises of prosecutorial discretion. *See United States v. Ojala*, 544 F.2d 940, 945 (8th Cir. 1976) (concluding that there was no purposeful discrimination when the decision to prosecute was based on legitimate consideration of the "potential deterrent effect" of the prosecution, consistent with applicable prosecutorial guidelines focused on deterrence value).

The Court also finds no merit to Defendants' argument that the rationality of federal enforcement priorities regarding marijuana-related activity is undermined by marijuana's status as a Schedule I substance. "The government lacks the means to investigate and prosecute every suspected violation" of the CSA and the enforcement priorities established in the Cole Memo are a rational response to this reality. *See id.*; *see also Armstrong*, 517 U.S. at 465 (stating that "'the Government's enforcement priorities'" and a "'case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake'") (quoting *Wayte v. United States*, 470 US 598, 607 (1985)).

Defendants have failed to offer any evidence of either prong of their selective prosecution claim and are therefore not entitled to an evidentiary hearing. *See Peterson*, 652 F.3d at 981–82

(concluding that the district court "properly denied an evidentiary hearing" on defendant's selective prosecution claim where defendant offered no credible evidence of discriminatory purpose).

### C.   Equal Sovereignty Claim

#### 1.   Legal Standard

The principle of equal sovereignty recognizes that "the constitutional equality of the states is essential to the harmonious operation of the scheme upon which the Republic was organized." *Coyle v. Smith*, 221 U.S. 559, 580 (1911). Different treatment of the states "can be justified in some cases," but "a departure from the fundamental principles of equal sovereignty requires a showing that a statute's disparate geographic coverage is sufficiently related to the problem that it targets." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009); *see also Shelby County*, 133 S. Ct. at 2623–24.

#### 2.   Analysis

Defendants assert that in light of the enforcement priorities expressed in the Cole Memo, as well as the policies announced in associated memoranda, enforcement of 21 U.S.C. §§ 812, Schedule 1(c)(10) and Schedule 1(c)(17) violates the doctrine of equal sovereignty. (Mem. in Supp. at 45–46). In response, the Government contends that equal sovereignty principles have no relevance in this case, where the statutory scheme at issue treats all states equally and where Defendants' invoke equal sovereignty principles to attack the legitimacy of prosecutorial discretion. (Mem. in Opp'n at 19–21).

The Court concludes that Defendants' equal sovereignty claim is without merit for three reasons. First, in making their equal sovereignty argument, Defendants rely heavily on the Supreme Court's recent decision in *Shelby County v. Holder*. *See* (Mem. in Supp. at 44–49). But,

as noted, *Shelby County* considered the extraordinary exercise of federal intrusion upon matters of state and local voting law, 133 S. Ct. at 2618, 2620, and "there is nothing in *Shelby County* to indicate that the equal sovereignty principle is meant to apply with the same force outside the context of 'sensitive areas of state and local policymaking.'" *Nat'l Collegiate Athletic Ass'n v. Governor of New Jersey*, 730 F.3d 208, 239 (3d Cir. 2013) (quoting *Shelby County*, 133 S. Ct. at 2624), *cert. denied*, 134 S. Ct. 2866 (2014). It can hardly be said that Congress's enactment of federal criminal laws, and the CSA in particular, involves an extraordinary exercise of its power or implicates similarly sensitive areas of state and local law. *See United States v. Comstock*, 560 U.S. 126, 136–37 (2010) (stating that "Congress routinely exercises its authority to enact criminal laws" and that Congress has "broad authority" to criminalize conduct in the course of carrying out its enumerated powers).

Second, Defendants cite no authority to support their position that it is appropriate to apply the equal sovereignty doctrine when the contested statute is a generally applicable criminal law, rather than a statute that specifically addresses the conduct or authority of states or political subdivisions. In *Shelby County*, the Court stated that the equal sovereignty doctrine is "highly pertinent in assessing . . . disparate treatment of **States**." 133 S. Ct. at 2624 (emphasis added); *see also id.* at 2619–23 (discussing county's challenge to a provision of the Voting Rights Act that created "covered" jurisdictions, thereby limiting the application of other provisions to certain states and political subdivisions); *Nw. Austin*, 557 U.S. at 197–204 (involving a challenge to a provision of the Voting Rights Act that established unique requirements applicable only to certain states and political subdivisions); *South Carolina v. Katzenbach*, 383 U.S. 301, 317–23 (1966) (involving a challenge to provisions of the Voting Rights Act that limited the application of unique requirements to certain states and political subdivisions); *Coyle*, 221 U.S. at 563–80

31

(involving a challenge to a federal law restricting, as a condition of statehood, Oklahoma's ability to change the location of its capital city). Here, the relevant provisions of the CSA do not express any requirements for or limitations on the actions of a particular state or set of jurisdictions. *See* 21 U.S.C. §§ 812, Schedule 1(c)(10) and Schedule 1(c)(17); *Id.* §§ 841(a)(1), 841(b)(1)(A), 846.

Indeed, Defendants' argue that enforcement of 21 U.S.C. §§ 812, Schedule 1(c)(10) and Schedule 1(c)(17) violates the equal sovereignty doctrine not because of the language of the statute itself, but because enforcement of the law "under the policy expressed in the Cole Memo[]" and related policy memoranda violates equal sovereignty principles. (Mem. in Supp. at 46.) To give credence to this argument would require this Court to adopt the view that broad prosecutorial enforcement priorities that are applicable in all jurisdictions, such as those reflected in the policy memoranda cited by Defendants, violate the equal sovereignty doctrine if they happen to result in disparate rates of prosecution among the states. This view is fundamentally inconsistent with the well-established principle that prosecutors "retain broad discretion to enforce the Nation's criminal laws." *Armstrong*, 517 U.S. at 464 (internal quotation marks omitted).

Finally, and most importantly, even if the equal sovereignty doctrine could be found to apply to the circumstances presented here, Defendants have presented no evidence of "'disparate geographic coverage.'" *Shelby County*, 133 S.Ct. at 2627 (quoting *Nw. Austin*, 557 U.S. at 203). The CSA applies with equal force in all states, and as the Court has already discussed at length, Defendants' repeated assertions that the federal government has decided to decline prosecution of individuals distributing marijuana in a manner consistent with state law are simply incorrect. The Cole Memo and other policy memoranda Defendants identify do not announce such a

policy, nor have Defendants' offered any other evidence that the CSA has been applied disparately to any states or individuals.

While Defendants cite H.R. 4660, 113th Cong. (2d Sess. 2014), an appropriations bill that would prohibit certain funds from being used to "prevent [specified states] from implementing their own State laws that authorize the use, distribution, possession, or cultivation of medical marijuana," in support of their equal sovereignty claim, H.R. 4660 provides no support for Defendants' position. As Defendants concede, the bill has passed the House of Representatives but has not passed the Senate and has not been signed by the President. (Reply at 26–27). Defendants seem to ask the Court to conclude that Congress has treated some individuals or states differently or that the CSA has been enforced in a discriminatory fashion pursuant to a bill that is not yet, and may never be, the law. The Courts finds no basis to rely on such speculative grounds in considering Defendants' equal sovereignty claim. As a result, the Defendants are not entitled to an evidentiary hearing or dismissal of the indictment on the basis of their equal sovereignty claim.

## III.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motions to Dismiss [Docs. No. 47, 56, 75] be **DENIED**.

Dated: August 15, 2014

_s/Steven E. Rau_____
Steven E. Rau
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **August 29, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those

objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.